Irving **SULMEYER and Arnold L. Kupetz, Co-trustees in Bankruptcy for Bubble Up Corporation, Plaintiffs-Appellants,**

v.

**COCA COLA COMPANY, Defendant-Appellee.**

No. 73–2231.

United States Court of Appeals, Fifth Circuit.

July 11, 1975.

Rehearing and Rehearing En Banc Denied Sept. 24, 1975.

8. *Supra*, n. 3.

Joseph M. Alioto, Lawrence J. Appel, Joseph L. Alioto, San Francisco, Cal., Glover McGhee, Clayton H. Farnham, Atlanta, Ga., Lawrence J. Moreno, Beverly Hills, Cal., for plaintiffs-appellants.

Charles L. Gowen, Hugh Peterson, Jr., Jack H. Watson, Jr., C. David Vaughan, Atlanta, Ga., for defendant-appellee.

---

\* Of the Third Circuit, sitting by designation.

Before THORNBERRY, COLEMAN and ROSENN \*, Circuit Judges.

THORNBERRY, Circuit Judge:

Irving Sulmeyer and Arnold Kupetz, Co-trustees in Bankruptcy for the Bubble Up Corporation, appeal the trial court's denial of their motion for judgment notwithstanding the verdict in their antitrust suit against the Coca Cola Company.[1] Alternatively, they claim that the trial court erred in denying their motion for a new trial. The trial court's rulings followed an eight week jury trial that ended with a general verdict for Coca Cola Company. We have carefully examined Bubble Up's numerous claims of error, and have concluded that Bubble Up had ample opportunity to develop its antitrust claims in the court below. The trial court properly submitted the case to the jury on instructions satisfactory to Bubble Up, and substantial evidence supports the jury's verdict in Coca Cola's favor. Therefore we affirm the trial court's actions in denying both post-trial motions.

## I. BACKGROUND

### A. The Lemon-Lime Soft Drink Market

Bubble Up Corporation manufactures a lemon-lime soft drink syrup that it sells to franchised bottlers. They bottle the syrup in accordance with Bubble Up's standards, and deliver the finished product to retailers for distribution to the ultimate consumers. Other soft drink syrup manufacturers market their products in a similar fashion. By the late 1950's, Coca Cola, Pepsi Cola, and Seven Up had effectively achieved nationwide distribution at the consumer level for their soft drinks. Each had done so through a series of franchise agreements with independent bottlers across the nation. Thus each company had franchised a distinct group of independent bottlers, though evidence indicated that some bottlers handled both

---

1. For convenience, we will refer to the appellants as the Bubble Up Corporation.

Coca Cola and Seven Up.[2] Seven Up was the dominant seller of lemon-lime soft drinks and was Bubble Up's chief competitor at the consumer level.[3]

Bottler profits vary as a direct function of consumer demand. Since substantial nationwide demand for Seven Up had developed, Bubble Up would have been hard pressed to convince a bottler franchised for Seven Up to change to a Bubble Up franchise. The company chose to avoid head to head competition with Seven Up for lemon-lime bottler franchises, and sought to achieve nationwide distribution through franchise agreements with bottlers holding Coca Cola or Pepsi Cola franchises.

In 1960 Bubble Up made a major corporate decision. Dissatisfied with efforts to achieve national distribution using both Coca Cola and Pepsi Cola franchisees, the company decided to seek to franchise Coca Cola bottlers exclusively. At about the same time the Coca Cola Company decided to market its own lemon-lime product—Sprite. In the end Bubble Up's efforts to achieve nationwide distribution through the bottlers franchised for Coke fizzled.

### B. *The Coca Cola Company's Entry Into the Lemon-Lime Market*

Dr. John S. Pemberton formulated the original Coca Cola syrup and extract in 1866 in Columbus, Georgia. He and J. M. Robinson began to distribute the product in Atlanta, Georgia. Pemberton fell ill and died in 1888. Asa G. Candler,

a former competitor, acquired all rights to the product by April 1891, and in 1892, transferred those rights to the Coca Cola Company, a newly formed Georgia corporation, in exchange for stock. Originally, the company sold its product to fountain retailers who mixed the syrup with carbonated water at the retail outlet for direct sale to the ultimate consumer. Around 1900 independent bottlers were licensed to mix and bottle the drink, then sell it to retailers. A nationwide system of franchised bottlers developed and that system became the primary channel for distribution of Coca Cola to retail outlets for sale to the consumer.

Through World War II, Coca Cola concentrated exclusively on selling its basic product, Coca Cola syrup, to the franchised bottlers. Then a shift in soft drink demand occurred, with consumers willing to purchase a more varied assortment of soft drinks. The demand shift at the consumer level produced a corresponding shift in bottler demand. Independent bottlers holding Coca Cola franchises began pressuring the Coca Cola Company to market a more varied line of syrups. Lemon-lime flavored soft drinks developed into the second largest line of soft drink flavors with Seven Up holding by far the largest share of that market.[4] A number of products competed for the consumer dollars in that market including Bubble Up, Sun Up, Uptown, and 50–50.[5] The development of soft drink lines other than cola drinks coincided with a period of rapid growth

---

**2.** Coca Cola and Pepsi Cola did not franchise the same bottlers. The two cola products directly compete at the consumer level. A bottler with a dual franchise might be hesitant to strongly promote one cola product over the other, with competitive detriment to both syrup manufacturers. To the extent that the lemon-lime segment of the soft drink market comprises a separate set of consumers, this conflict is lessened. Non-cola soft drinks and cola products are sufficiently competitive at the consumer level, however, to make dual franchises for Coca Cola and Seven Up relatively rare.

**3.** In the late 1950's, Seven Up began to increase its share of the total soft drink market,

taking advantage of its ability to satisfy increased consumer demand for lemon-lime soft drinks.

**4.** By 1960 the lemon-lime segment of the soft drink market accounted for 10.5% of total soft drink sales. Seven Up made over 80% of the total lemon-lime drink sales.

**5.** Evidence indicated that other drinks competed in this submarket as well, including citrus drinks (e.g., Squirt), and various ginger ales. However, those products were really minor competitive factors. Collectively these products comprised the "green bottle" market.

and increasing sophistication in vending machines. Bottlers sought additional flavor lines to supply a full range of products at retail vending machine outlets. Coca Cola responded to this consumer and bottler demand in 1958 with the Fanta line of soft drink products. That line included orange, grape, root beer, strawberry, ginger ale, and club soda.

Coca Cola decided to compete very actively in the lemon-lime segment of the soft drink industry in 1960. It opted to enter the market through internal expansion.[6] Coca Cola already had a nationwide system of franchised bottlers for its Coca Cola syrup. Understandably the company looked to those bottlers to handle Sprite. Several factors influenced Coca Cola in this regard. Introduction of Sprite was in some measure a response to already existing Coca Cola franchisee demand. Coca Cola employees had a working relationship with franchised bottlers that could be used to Coke's advantage in introducing Sprite at minimum expense. There would be economies of scale in using the existing field marketing organization to market the new product. And the company did not wish to deal with bottlers handling a competing cola product.

The decision to use its already existing distribution system placed Coca Cola on a collision course with Bubble Up—both companies competing to franchise the same group of independent bottlers. From 1961–66, the two companies fought rather fiercely, with Bubble Up the clear loser. Bubble Up contends that the Coca Cola Company did not fight fairly and violated Sections 1 and 2 of the Sherman Act. The jury below disagreed, but

Bubble Up seeks to overturn that verdict.

## II. BUBBLE UP'S MOTION FOR JUDGMENT N.O.V.

Bubble Up moved in the trial court for judgment n.o.v. on its Section 1 and 2 claims. The trial judge denied the motion, rejecting each claim that Bubble Up raised. Here Bubble Up seeks reversal, but fights an uphill battle. Generally a motion for directed verdict or judgment n.o.v. should be granted only in two situations: "First, where there is a complete absence of pleading or proof on an issue or issues material to the cause of action or defense. . . . Second, where there are no controverted issues of fact upon which reasonable men could differ." 5A Moore's Federal Practice ¶ 50.02[1] (2d ed. 1974). *Accord* Alman Bros. Farms & Feed Mill, Inc. v. Diamond Lab., Inc., 437 F.2d 1295 (5th Cir. 1971). In passing on the motion, the trial court must view the evidence in the light most favorable to the party opposing it, giving that party the benefit of all reasonable inferences in its favor. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969). The standard of review at the appellate level is the same. 9 C. Wright & A. Miller, Federal Practice and Procedure § 2524 (1971).

### A. *Bubble Up's Section 1 Claims*

Bubble Up argues that it was entitled to a directed verdict on its Section 1 claims because it conclusively proved various *per se* violations.[7] Appellants challenged a number of marketing practices the Coca Cola Company employed in connection with Sprite's introduction in the early 1960's claiming they constituted tying arrangements or group boy-

---

6. Fred W. Dickson's testimony indicated there was some pressure at the time to enter the green bottle market through acquisition of the Bubble Up Corporation. Record Vol. 2 at 52.

7. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . . Every person

who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C. § 1.

cotts—both *per se* violations of the Sherman Act.[8] The trial court denied Bubble Up's motions for a directed verdict and judgment n.o.v. on those claims. It did, however, instruct the jury as to boycotts and tying arrangements, but the jury's verdict rejected Bubble Up's Section 1 claims. We find the district court properly denied Bubble Up's motions as the evidence does not conclusively demonstrate any Section 1 violations.

1. *The Investment Market Program:*

Bubble Up directs the major thrust of its Section 1 attack against the Investment Market Program Coca Cola employed from 1961 to 1963. We examine this program in some detail as our dispostion of the Section 1 arguments here helps answer Bubble Up's attack on various other Coca Cola Company programs.[9]

To successfully market Sprite nationwide, the Coca Cola Company had to do two things: (1) stimulate sufficient consumer demand to make production economical; and (2) develop an effective delivery system. Coke already had a nationwide distribution system for its primary product, Coca Cola. It decided to look to the network of Coca Cola franchised bottlers to establish a nationwide distribution system for Sprite. To stim-

ulate consumer demand for the new product, Coke developed an advertising program that made extensive use of television.

During the late 1950's television replaced radio as the dominant advertising medium. Though extremely effective, it was also extremely expensive.[10] The Coca Cola Company commissioned the McCann-Erickson Advertising Agency of New York City to develop a comprehensive advertising program for Sprite using the new medium. Through a computer study the agency determined that an advertisement broadcast over 197 selected television stations would reach the home TV sets of most of the nation's soft drink consumers. In formulating its proposal, McCann-Erickson divided the country into 197 television marketing areas, geographically defined by the reach of the 197 television signals. Not surprisingly, the geographical territory served by the individual bottlers Coke sought to franchise for Sprite did not correspond to the 197 television marketing areas.[11]

The Sprite Investment Market Program (IMP) sought to utilize the 197 television marketing areas to stimulate demand through an effective and efficient advertising program. Under this pro-

---

8. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (tying arrangements); United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (group boycotts).

9. The Sherman Act's statute of limitations apparently bars Bubble Up's Section 1 challenge to the Investment Market Program. 15 U.S.C. § 15b provides in pertinent part: "Any action to enforce any cause of action under sections 15 and 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued." The Coca Cola Company discontinued the IMP in October 1963, and Bubble Up did not file its complaint until January 2, 1968. Bubble Up seeks to avoid the statute of limitations bar by claiming that Coca Cola engaged in a continuing course of exclusionary conduct. We doubt the validity of that approach here. *See* Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). However, we reach the merits of Bubble Up's chal-

lenge to the IMP because of its relevance to the intent issues in the Section 2 charge.

10. *See* Note, Advertising and Shared Monopoly in Consumer Goods, 9 Colum. J. Law & Soc. Prob. 241, 253–55 (1973).

11. Bubble Up asserts that the bottler territories did not correspond to the television market areas because of vertical territorial restrictions. Therefore it claims the IMP is an illegal product of those restrictions. Yet Bubble Up did not specifically make this argument at the trial, nor did it request jury instructions on this theory. See Section II.A.2., *infra.*

The trial evidence on the point is sketchy. Bottler territorial limitations are a function of factors like plant capacity, delivery truck range, available labor force, etc. The designated television marketing areas for advertising were a function of the power of the area TV transmitter. It seems doubtful that bottler territorial limitations had any impact on the advertising program for Sprite. Certainly the trial evidence on the point is not conclusive.

gram, when Sprite became available to 80% of the consumers in a television marketing area, the company would spend twenty cents on television advertising for every Sprite syrup gallon sold to area bottlers over a three year period. That expenditure supplemented a twenty cent per gallon advertising allowance that each individual bottler received under the standard Sprite franchise agreement.[12]

The program contemplated substantial increases in consumer demand for Sprite in its second and third years. The company obligated itself to spend forty cents per gallon over the standard contract allowance during the first year, and an extra twenty cents per gallon in the second. Under the IMP the company would expend the extra twenty cents in the third year on gallonage in excess of first year purchases.

Coke based its initial outlay in a given marketing area on the total estimated first year gallon purchases of that area's Sprite bottlers. If Coca Cola's first year estimate was 30,000 gallons, the company would spend a total of $18,000 to advertise Sprite over that area's television station. Of the total, $12,000 represent advertising purchased under the IMP, while the twenty cents per gallon contract allowance would account for the remaining $6,000. The company estimated the initial outlay for the second and third years in a similar fashion, but took actual past sales experience into account.[13] Bubble Up seeks to bring this

12. The price term of the standard Sprite franchise agreement read as follows:

| Price of Concentrate | Price of Syrup |
|---|---|
| Sprite _____per unit * | _____per gallon * |

\* The above prices incude an advertising allowance of (1) five cents (5¢) per gallon of syrup, or equivalent gallon of concentrate, which, however, can only be spent for point-of-sale material approved by Fanta Beverage Company and (2) an additional sum of twenty cents (20¢) per gallon of syrup, or equivalent gallon of concentrate, purchased by BOTTLER under this agreement shall be spent, one-half (½) of said amount on advertising or promotions mutually agreed upon by BOTTLER and COMPANY, and one-half (½) of said amount in such manner and form as Fanta Beverage Company deems desirable.

Additionally the contract obligated the bottler "To vigorously promote the sale of the Beverage [Sprite] through the preparation or formulation of sales, advertising and promotional plans and to spend reasonable sums therefor." Thus in performance of his obligation to vigorously promote Sprite through advertising, the franchisee could apply five cents of the purchase price of a gallon of Sprite syrup or concentrate equivalent to purchase point of sale advertising material. An additional twenty cents per gallon was spent for other advertising or promotions.

Under the contract provision the bottler had partial control over the expenditure of one half of the twenty cent allowance. Trial testimony indicated however that in practice the Coca Cola Company exercised complete control over the entire contract advertising allowance during the existence of the IMP.

Q Now, the advertising, of course, this is advertising that Coca-Cola spends to advertise the product?

Coca-Cola doesn't give the money over to the bottler, right?

A No.

Testimony of Thomas C. Law, Record Vol. 22 at 119.

13. The IMP was not particularly successful in practice. The Coca Cola Company counted on the increase in Sprite gallon sales for the second and third years of the program to keep actual advertising expenditures relatively constant over the IMP's lifespan. As former Coca Cola executive Thomas C. Law explained, this did not occur.

And it didn't work for a very good reason.

. . .

There wasn't enough advertising because, for example, let's say the bottler is going to do 10,000 gallons of syrup the first year. We were going to spend 60 cents a gallon. That would mean we would spend $6,000.

The second year, we were only going to spend 40 cents a gallon. So, in order to spend the $6,000, the bottler would have to do 15,000 gallons, 15,000 times 40 cents is $6,000 again. So, again as much syrup. He would have to have a 50 percent increase in business in order to have $6,000 advertising.

The third year we were only going to spend 20 cents. On the third year he had to do 30,000 gallons of syrup in order for us to spend $6,000.

. . . . .

Cost was going up. Cost of television advertising was getting higher.

So, we were faced with a situation where the bottler had to have a 50 percent increase the second year and had to double his business the third year in order for us to have the same amount of advertising dollar.

program within the Sherman Act's definition of a tying arrangement.

■ In Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1953), the Supreme Court defined a tying arrangement as: "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . ." 356 U.S. at 5, 78 S.Ct. 518. Tying agreements are regarded as illegal *per se* because they curb competition on the merits in the tied product. Standard Oil Co. of California v. United States, 337 U.S. 293, 305–06, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). "They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market." Northern Pac. Ry. Co. v. United States, *supra* 356 U.S. at 6, 78 S.Ct. at 518. An illegal tying arrangement has four basic characteristics: (1) two separate products (the tying and the tied product); (2) sufficient economic power in the tying market to coerce purchase of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market.[14] Driskill v. Dallas Cowboys Football Club, Inc., 498 F.2d 321 (5th Cir. 1974); Coniglio v. Highwood Services, Inc., 495 F.2d 1286, 1289 (2d Cir. 1974).

■ It is clear that Bubble Up's attempt to characterize the IMP as an illegal tying arrangement must fail. Coca Cola Company was the sole manager of the IMP funds. It was Coke that negotiated with the television stations for the purchase of advertising time. The individual bottlers had no voice in determining the advertisements' content or time slots.[15] Nor did they handle any funds spent under the program. Coca Cola determined which bottlers qualified for the IMP in a given area. The individual bottler obviously benefited from the additional advertising, but he did not "purchase" it.[16] Thus the tying arrangement

Well, obviously, this didn't work, because he just didn't do that. The product didn't grow that fast, and the television cost went up, now [sic] down, and, as you did more business, you would need more advertising.
So, as soon as we could we did away with investment market. We abandoned it.
Record Vol. 16 at 22–24.
Actually Mr. Law is incorrect about the increase necessary for the third year. A bottler would have to increase purchases to 20,000 gallons rather than 30,000 to achieve the $6,000 figure. *See* text following n.12, *supra*.

**14.** Both Sherman Act § 1, 15 U.S.C. § 1 (1970), and Clayton Act § 3, 15 U.S.C. § 14 (1970), prohibit tying arrangements. But § 3 only applies where both the tying and the tied products are "goods, wares, merchandise, machinery, supplies or other commodities." The standards of proof under the two sections differ. To establish an illegal tying arrangement under § 1, the antitrust plaintiff must show (1) sufficient economic power in the tying product to appreciably restrain competition in the tied product, *and* (2) that the tying arrangement affects a not insubstantial amount of interstate commerce. Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). But under § 3, the plaintiff suc-

ceeds if he establishes either of the above elements. *Id. See also* Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970); Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 74 Harv.L.Rev. 50, 55–59 (1958); Comment, Franchise Tie-Ins and Antitrust: A Critical Analysis, 1973 Wis.L.Rev. 847, 851–55.

**15.** Given the economics of television advertising, an individual Sprite bottler could not economically conduct a television advertising program in his bottling territory. Television advertising has significant economies of scale, and large national advertisers can obtain the most favorable time slots, and get quantity discounts on advertising purchases. Note, Advertising and Shared Monopoly in Consumer Goods, 9 Colum. J. Law & Soc. Prob. 241, 254–55 (1973).

**16.** *Cf.* Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972) (franchisee could obtain franchise only if they agreed to purchase franchisor's cookers, fryers, paper packaging supplies, and spices); Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), cert. dism'd, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1968) (franchisee re-

cases that Bubble Up cites are inapposite to this situation.

■■ Bubble Up also seeks to characterize the IMP as a group boycott or a concerted refusal to deal—another *per se* violation of Section 1. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originator's Guild v. Federal Trade Comm., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); ·Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1915). We find that Bubble Up Corporation has failed to conclusively demonstrate that the IMP falls within the group boycott definition.

A comparison between the IMP and the practices involved in *Klor's Inc.* is illustrative. Broadway-Hale Stores, Inc., a department store chain, operated a branch store next door to Klor's Inc., a small San Francisco appliance store. Klor's alleged that Broadway-Hale conspired with major appliance manufacturers and distributors either not to sell to Klor's or to sell at discriminatorily high prices, putting Klor's at a severe competitive disadvantage. The Supreme Court reversed a summary judgment in favor of Broadway-Hale, holding that the allegations sufficiently described a group boycott or concerted refusal to deal that was illegal *per se.*

■ Under the Investment Market Program, the Coca Cola Company agreed to purchase additional television advertising in a given television marketing area once Sprite was available to 80% of the consumers there. Coca Cola did not require bottlers to discontinue Bubble Up to gain the additional advertising. *Cf.* United States v. General Motors

Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Bubble Up presented evidence on the economic impracticality of bottling two lemon-lime products, arguing that the necessary effect of the arrangement was an agreement to refuse to deal with Bubble Up. But the absence of an explicit agreement to exclude Bubble Up made the purpose of the IMP a jury question, and substantial evidence supports their verdict in Coca Cola's favor. *See* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

The absence of a *per se* violation makes the issue the reasonableness of the IMP. Coca Cola offered economic justifications for the program sufficient to support the jury's implicit finding of reasonableness. In the soft drink industry, a large scale advertising program is essential to build consumer acceptance of a new product. The expense of such a program presents a substantial barrier to entry. The Sprite television advertising program was the Coca Cola Company's solution to the problem of entry into the green bottle market. An individual advertisement would reach a given number of potential customers in the geographical area covered by the television station's signal. But if Sprite were not available at local retail outlets, the resultant buyer frustration would offset the demand the advertisement had stimulated. Under the IMP Coca Cola would not make the substantial extra expenditures in a television marketing area until satisfied that sufficient distribution capacity existed to meet the consumer demand generated.

The IMP was not so clearly exclusionary as to warrant *per se* treatment un-

---

quired to purchase all store equipment and supplies from franchisor). Coca Cola Company advertising purchases actually defrayed business expenses that the bottler might otherwise have incurred to effectively market Sprite in his area of operations.

Our disposition of Bubble Up's tying arrangement claim obviates any consideration of Coca

Cola's contention that Sprite syrup and Sprite advertising really are one product for antitrust purposes. *See* Kugler v. AAMCO Automatic Transmissions, Inc., 460 F.2d 1214 (8th Cir. 1972); United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

der Section 1. Bubble Up could still reach the soft drink consumer through franchise agreements with other independent bottlers. Other evidence indicated the effect of the IMP was to increase competition on the green bottle market at the consumer level. Given the relevant economics, the jury could properly have found the 80% requirement reasonable. Bubble Up was not entitled to a directed verdict or judgment n.o.v. on the Section 1 claim against the IMP.

### 2. Vertical Territorial Restrictions

■■ Bubble Up also claims injury resulting from vertical territorial restrictions that Coca Cola Company imposed on its franchised bottlers. It is true that in almost all cases vertical territorial restrictions imposed by the manufacturer of a product after he has parted with dominion over it are illegal *per se.* United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856–1865, 18 L.Ed.2d 1249 (1967). As our Circuit noted in Copper Liquor, Inc. v. Adolph Coors Co., 506 F.2d 934 (5th Cir. 1975), "[n]otwithstanding, Standard Oil Co. v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, *Topco* [United States v. Topco Assoc., Inc., 1972, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515] and *Schwinn* [United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249] read together, suggest that at this point we must accept the fact that the Court has set its face against both horizontal and vertical territorial restrictions, with the possible exception of vertically imposed restrictions by 'new entrants' and 'failing companies' briefly mention in *Schwinn.*" 506 F.2d at 943. But the record clearly forecloses this challenge.

In the district court, Bubble Up argued that certain Coca Cola Company marketing practices constituted *per se* violations of the Sherman Act. But, the *per se* violations alleged were group boycotts and tying arrangements; Bubble Up never mentioned vertical territorial restrictions. Bubble Up moved for a directed verdict after presenting its own case, and renewed that motion at the close of all the evidence. Not once did Bubble Up mention vertical territorial restrictions in those motions. Further, Bubble Up did not object to the trial court's jury instructions for failure to instruct on vertical territorial restrictions, and did not mention them in its own proposed jury instructions. Bubble Up finally complained of the territorial restrictions in its brief supporting the motion for judgment n.o.v.

■■ Under Fed.R.Civ.P. 50, "[a] motion for directed verdict shall state the specific grounds therefor." Fed.R.Civ.P. 50(a). If denied, a party may move within ten days after entry of judgment "to have the verdict and any judgment entered thereon set aside and to have judgment entered *in accordance with his motion for a directed verdict . . . .*" Fed.R.Civ.P. 50(b) (emphasis supplied). "A motion for judgment notwithstanding the verdict, like a motion for a directed verdict, must state the grounds on which it was made. Since it is technically only a renewal of the motion for a directed verdict made at the close of the evidence, it cannot assert a ground that was not included in the motion for a directed verdict." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2537 (1971). *Accord* House of Koscot Dev. Corp. v. American Line Cosmetics, Inc., 468 F.2d 64 (5th Cir. 1972). Having failed to assert claims based on vertical territorial restrictions during the trial, Bubble Up was not entitled to raise those issues in its motion for judgment n.o.v.[17]

### 3. Other Section 1 Claims

Bubble Up also claims that other Coca Cola Company marketing practices con-

---

17. It would be a constitutionally impermissible re-examination of the jury's verdict for the district court to enter judgment n.o.v. on a ground not raised in the motion for directed verdict. *Compare* Baltimore & Carolina Line, Inc. v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636 (1935) *with* Slocum v. New York Life Ins. Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879 (1913).

stituted *per se* violations of Section 1. We consider these programs separately.

### a. *The Equipment Lending Program*

In 1965, the Coca Cola Company began to loan fountain syrup dispensing equipment to high volume retailers.[18] The machinery involved dispensed post-mix products,[19] and Coca Cola required the retailer to dispense Coca Cola Company products through all but one valve. The company franchised about 4100 independent wholesalers to service the equipment. Approximately 700 franchisees were independent bottlers also franchised for Coca Cola.[20]

■ Bubble Up claims that this program is *per se* illegal, but fails to articulate the rationale for that conclusion. We cannot perceive one. The company did not require the retailer to cease selling any product to gain the benefits of the program. Nor did the company forbid the retailer from using other post-mix equipment for competing products. One effect of the program was to increase the number of post-mix products the retailer could sell to the consumer. This competitive benefit is hardly a characteristic of a *per se* illegal practice.

■ Bubble Up gave its franchised bottlers the right to sell to fountain outlets, while Coca Cola had traditionally retained for itself the right to sell to the fountain trade. In Bubble Up's view, Coca Cola initiated its program to exclude Bubble Up and to make Sprite franchises more attractive to independent bottlers. Coca Cola offered contrary testimony on the question of intent, and presented evidence that the program gave retail outlet consumers an increased number of soft drink choices. Under these circumstances, the question of the exclusionary intent and effect of the practice was for the jury. The verdict in Coca Cola's favor is clearly supported by the evidence.

### b. *Cash Bonuses*

A 1964 Coca Cola Company program offered cash bonuses to bottlers for increased Coca Cola sales. Under the program, a Coca Cola franchised bottler participating in a TV co-op would receive a cash bonus of 18 cents per gallon for the amount his 1964 consumption exceeded the 1963 level. The Coca Cola Company did not restrict the use of the cash bonus, but encouraged its expenditure on advertising by offering to increase the bonus 33⅓%. The company offered increased bonuses to those bottlers handling allied Coca Cola Company products such as Sprite, Tab, or Fanta beverages. For example, a Coca Cola bottler with a franchise for Sprite received an additional 2½ cents per gallon allowance on the increased Coca Cola sales. The bonus was based purely on the increase in Coca Cola sales.

■ There is no tying arrangement or group boycott here. The program's

---

**18.** Wilson B. Franklin, Vice President of Coca Cola USA and manager of the fountain sales department, testified that Coca Cola initiated this program purely in response to competitors' similar programs. Record Vol. 23 at 136–37. Coca Cola did not use the program in areas where competitors were not employing it, and would discontinue it in areas where rival soft drink companies abandoned their programs. Record Vol. 23 at 140–41.

**19.** Post-mix products are soft drinks mixed and dispensed on retail outlet premises with post-mix equipment. Mr. Franklin explained the mechanics of a post-mix system:

> Post-mix equipment is equipment that can take the syrup, whether it would be Coca-Cola syrup or any other syrup, they have a carbonating unit, a refrigerating unit, and a

dispensing mechanism, those are the three basic components, from which they can dispense the drink then one at a time. That mechanism may be a one-drink unit, two-drink unit, three-drink unit, four-drink unit. Fast food operations such as McDonald's, Burger Chef, or Burger King are typical users of a post-mix system.

**20.** Bottlers with franchises to bottle Coca Cola or Sprite had no direct connection with the equipment lending program. The Coca Cola Company made the equipment lending agreements directly with the retailer. The company then contracted with fountain syrup wholesalers for maintenance, but not all Sprite or Coca Cola bottlers had franchises to wholesale syrup.

primary goal was to increase Coca Cola sales. The Coca Cola Company felt that an increase in Coca Cola demand would result in increased sales of allied products as well. Record Vol. 16 at 84. Hence the Company increased the bonus to a bottler with franchises for several Coca Cola products. The evidence indicated that the actual amount of increased bonus for a bottler with a Sprite contract was rather small, minimizing the incentive for a bottler to take on Sprite purely because of the bonus. The jury implicitly found that this practice had legitimate business purposes, and did not constitute an unreasonable restraint on trade. We see no justification for overturning that jury finding.

### c. Various Interchange Programs

 Bubble Up charges that several programs allowing a bottler franchised for more than one Coca Cola product to interchange advertising credits constituted *per se* violations of Section 1, and provided the requisite specific intent for conspiracy and attempt to monopolize under Section 2. Bubble Up implies that requiring a bottler to sign a franchise for an allied product before receiving the interchange authority creates an illegal tying arrangement. But the argument fails. A Coca Cola franchisee could clearly obtain franchises for allied products singly. Merely conditioning interchange authority on the existence of particular franchises does not create an illegal tie-in.

 Coca Cola Company presented evidence that these programs enabled the company to allocate its advertising for all of its product lines in a particular area in a more efficient fashion. Thus, if Tab were selling particularly well in one area, the company could spend some of the Tab commitments on Sprite advertising in an attempt to increase consumer demand for that product. The

jury could reasonably have found that this was a legitimate business practice.

### d. Miscellaneous Marketing Programs.

 Bubble Up makes various other challenges to Coca Cola Company marketing practices. We have carefully examined the record evidence as to these programs, and concluded that they do not fall in the *per se* category. The evidence of exclusionary purpose and effect of these programs was conflicting and in each case the Coca Cola Company presented testimony tending to establish legitimate business justification for the practices questioned. The question of their purpose and effect was for the jury, and we find sufficient support in the record to uphold their verdict as to the Section 1 claims.

### B. Monopolization Claims Under Section 2

 The Coca Cola Company eventually secured Sprite franchises with about 85% of those independent bottlers also franchised for Coca Cola. Bubble Up contends that Coca Cola's success in franchising this group of bottlers for Sprite constituted monopolization of the relevant bottler market in violation of Section 2.[21] Coca Cola, on the other hand, argues that the relevant universe of bottlers is not so limited. It claims that all independent bottlers were potential franchisees for Bubble Up in their quest to achieve national distribution. Therefore Bubble Up did not demonstrate that Coca Cola Company possessed sufficient monopoly power to violate Section 2. We think that the jury could properly have found that the relevant market consisted of all independent bottlers across the country, and, therefore we affirm the verdict favorable to the Coca Cola Company on the Section 2 claim.

---

**21.** "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ." 15 U.S.C. § 2.

■■■ The essence of the monopolization offense under Section 2 is "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); Woods Exploration & Pro. Co. v. Aluminum Co. of Amer., 438 F.2d 1286, 1304 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). Monopoly power is "the power to control price or exclude competition." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); Turner, Antitrust Policy and the Cellophane Case, 70 Harv.L. Rev. 281, 288 (1956). Monopoly power does not exist in a vacuum. The antitrust plaintiff bears the burden to show the defendant possesses monopoly power in the relevant market. Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177–78, 86 S.Ct. 347, 15 L.Ed.2d 247 (1956); American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Telex Corp. v. IBM, 367 F.Supp. 258, 335 (N.D.Okla.1975), rev'd on other gds., 510 F.2d 894 (10th Cir. 1975). Definition of the relevant market is basically a fact question heavily dependent upon the special characteristics of the industry involved. Telex Corp. v. IBM, 510 F.2d 894 (10th Cir. 1975); Acme Precision Products, Inc. v. American Alloys Corp., 484 F.2d 1237 (8th Cir. 1973); Cherokee Laboratories, Inc. v. Rotary Drilling Serv., Inc., 383 F.2d 97 (5th Cir. 1967), cert. denied, 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870 (1968).

The trial court below submitted the question of the relevant market to the jury with instructions.[22] Bubble Up now argues that, as a matter of law, the independent bottlers franchised for Coca Cola comprised the relevant market. Bubble Up further argues that the undisputed facts showed *per se* violations of various Sherman Act provisions, entitling Bubble Up to a directed verdict on the liability issues, and leaving only the question of damages for the jury.

We think that the trial court properly denied the motions for directed verdict and judgment n.o.v. Bubble Up and Sprite compete on two levels; both seek bottler franchises and consumer acceptance at the retail level. Testimony at trial showed that, when the Coca Cola Company introduced Sprite, lemon-lime drinks accounted for about 10–12% of total soft drink sales. Also, soft drink syrup manufacturers considered the lemon-lime segment of the soft drink market a separate segment of the retail market.[23]

—

Seven Up dominated the "green bottle" market with over 80% of total sales at the consumer level. To date, neither Bubble Up nor Sprite has been able to make substantial inroads on Seven Up's position in that submarket. Currently Sprite has about 11% of total consumer sales in the "green bottle" market. Sprite clearly did not have monopoly power at the consumer level, and Bubble Up does not claim otherwise.

Instead Bubble Up charges that Coca Cola illegally prevented it from obtaining sufficient bottler franchises to gain national distribution for its product by monopolizing the relevant market of soft

22. Bubble Up did not object at trial to the relevant market instruction the trial court gave; nor does it challenge the adequacy of that instruction here.

23. Calvin C. Stoddard, a Coca Cola employee, testified:

The lemon-lime market accounted for 10 or 12 percent of the total market. We, the Coca Cola Company, did not have an entry there. We wanted Sprite as our entry in the lemon-lime market. We wanted to advertise it and put it in the home and cooler market. Record Vol. 8 at 68. At the time the Coca Cola Company introduced Sprite, Mr. Stoddard was a district manager in Detroit, Michigan. He subsequently held various other positions with the company and was on the marketing staff for company owned plants at the time of trial.

drink bottlers. But evidence indicated that any independent bottler could effectively bottle and distribute Bubble Up. The soft drink bottling process is basically the same for all flavors. An independent bottler franchised for Pepsi Coca or Seven Up was still a potential franchisee as the independent bottlers in a given area were reasonably interchangeable. *See* United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Each of the 3500 independent bottlers made its own business decision on whether to bottle and distribute a lemon-lime soft drink, which lemon-lime syrup to purchase, and how many lemon-lime drinks to handle.

■■■ The fact that Bubble Up and the Coca Cola Company sought franchise agreements with the same group of independent bottlers does not limit the relevant market to those bottlers. Telex Corp. v. IBM, 510 F.2d 894 (10th Cir. 1975); Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1920). Both Bubble Up and Coca Cola sought to achieve nationwide distribution of their lemon-lime soft drink at the consumer level. Evidence indicated that Bubble Up could reach the consumers in a given area through a franchise agreement with *any* independent bottler. The jury could properly have found that all 3500 were potential Bubble Up franchisees.[24] While Bubble Up showed that by 1967 the Coca Cola Company had secured Sprite franchise agreements with 787 of the 934 Coca Cola bottlers, those 787 bottlers represented only about 22% of 3554 independent bottlers. That is an insufficient market share to establish monopolization in violation of Section 2. *See* United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *cf.* United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct.

1698, 16 L.Ed.2d 778 (1966); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945). Thus the trial court properly denied Bubble Up's motion for judgment n.o.v. on the monopolization claim.

■■■ Bubble Up also charges that the Coca Cola Company attempted to monopolize and conspired to monopolize in violation of Section 2. The district court instructed the jury that "In order to determine whether the defendant has monopolized, attempted to monopolize, or combined to monopolize a particular field of competition, you must first determine what is the field of competition or relevant market." The court then defined the essential elements of the attempted monopolization and conspiracy to monopolize offenses. Yet the jury found that Coca Cola had not violated Section 2. We find sufficient support in the record to uphold that finding.

■■■ The Supreme Court has defined attempt to monopolize as follows:

> The phrase "attempt to monopolize" means the employment of methods, means and practices which would, if successful accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it . . . .

American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127 (1946). The offense of attempted monopolization requires both specific intent to accomplish the illegal result (acquisition of monopoly power in the relevant market), and a dangerous probability of success in that endeavor. As Justice Holmes said:

> Intent is . . . essential to such an attempt [to monopolize]. Where acts are not sufficient in themselves to

---

24. Both parties agree that the relevant geographic market was the nation as a whole. That premise appears correct. *See* United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The Coca Cola

Company and the Bubble Up Company sought to market their syrup concentrate to independent bottlers in all areas of the country to achieve and maintain nationwide distribution at the consumer level.

produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. . . . But when that intent and the consequent dangerous probability exist, [Section 2] . . . directs itself against that dangerous probability as well as against the completed result.

Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). See Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); American Tobacco Co. v. United States, supra ; Scranton Const. Co. v. Litton Indus. Leas. Corp., 494 F.2d 778 (5th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975); Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203 (5th Cir. 1969).

As noted above, the jury could properly have determined that the more than 3500 independent bottlers across the country comprised the relevant market for sale of lemon-lime soft drink franchises. No evidence indicated that the Coca Cola Company intended to give Sprite franchises to bottlers not franchised for Coke. We think the jury could have concluded that the Coca Cola Company did not have the specific intent to gain monopoly power in the relevant market. That obviates any inquiry into the probability that Coca Cola would succeed in gaining a monopoly position. Cf. Panotex Pipe Line Co. v. Phillips Petroleum Co., 457 F.2d 1279 (5th Cir.), cert. denied, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972).

 A similar analysis mandates approval of the jury's verdict on the combination or conspiracy to monopolize claim. Bubble Up had to convince the jury that Coca Cola Company and the groups of independent bottlers across the country who were franchised to bottle Coca Cola combined and conspired to prevent Bubble Up from obtaining the bottler franchises needed to achieve national distribution at the consumer level. American Tobacco Co. v. United States, 328 U.S. 781, 785–86, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Numerous witnesses testified to the business justifications for marketing Sprite through the bottlers already franchised for Coca Cola. The various incentive programs had business justifications as outlined above. Further, Coca Cola did not require bottlers to cease bottling Bubble Up as a condition to bottling Sprite. Viewing the evidence in the light most favorable to Coca Cola, a jury could reasonably have found that Coca Cola did not have the specific intent to prevent Bubble Up from obtaining lemon-lime franchises in the relevant market composed of all independent bottlers. Again the fact that Bubble Up and Coca Cola chose to compete for the same group of bottlers does not limit the relevant market to that group. Since as a practical matter, most bottlers would only sign one lemon-lime franchise agreement, Coca Cola intended to franchise certain bottlers to the exclusion of Bubble Up. But the jury found that Coca Cola fought fairly and won. This is competition on the merits—the *summum bonum* of the Sherman Act. We affirm the denial of the motion for judgment n.o.v. on the attempt and conspiracy claims under Section 2.

## III. MOTION FOR NEW TRIAL

Bubble Up alternatively sought a new trial on the following grounds: (1) the court improperly instructed the jury on the treble damages provisions of the antitrust laws; (2) defense counsel's improper jury argument; and (3) improper admission of irrelevant and prejudicial evidence. The trial court denied Bubble Up's motion, and Bubble Up asks that we overturn that decision.

 Fed.R.Civ.P. 59 governs motions for new trial. That rule empowers a trial court to grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Decision on a motion for new trial requires an exercise of discretion by

the trial court. United States v. Bucon Const. Co., 430 F.2d 420 (5th Cir. 1970); Commercial Credit Corp. v. Pepper, 187 F.2d 71 (5th Cir. 1951). The scope of appellate review of the trial court's decision is narrow as the trial judge's discretion is broad, and reversal warranted only when he has abused it. Massey v. Gulf Oil Corp., 508 F.2d 92 (5th Cir. 1975); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2818 (1973). We have carefully reviewed the grounds asserted by Bubble Up in its motion for new trial in the context of the entire record. We find that the trial judge was well within the area of his discretion in denying a new trial.

Bubble Up complains vigorously of the trial court's action in instructing the jury that any damages awarded to Bubble Up would be trebled under the provisions of the antitrust laws. Bubble Up also complains of prejudice resulting from the jury argument of Coca Cola Company's counsel relative to the trebling provision.

At the time of the trial, the Fifth Circuit had not yet taken a definite position on the propriety of a treble damages instruction in an antitrust trial. Decisions in other jurisdictions conflicted.[25] The trial judge elected to give the instruction, but also told the jury they were to assess damages based upon the actual loss incurred, if any.

■■■ The trial judge's actions constituted error under our subsequent decision in Pollock & Riley, Inc. v. Pearl Brewing Co., 498 F.2d 1240 (5th Cir. 1974). See also Wood v. Gulf Oil Corp., 498 F.2d 1240 (5th Cir. 1974), cert. denied, —— U.S. ——, 95 S.Ct. 1427, 43

L.Ed.2d 673 (1975). However, we feel that Bubble Up suffered no prejudice from this error that would require a new trial. The jury specifically found no violations of Sections 1 and 2. As we have previously indicated, ample record evidence supports that determination. Since the jury found no liability, we do not regard the error in the damage instruction as sufficient basis for a new trial. We reach the same conclusion with regard to the complaint about defense counsel's jury argument relating to the trebling provision.

■■■ Bubble Up also seeks a new trial on the ground that the trial judge's action in admitting certain evidence relating to mismanagement and dissension in the Bubble Up Corporation denied it a fair trial. We think the trial court properly admitted the challenged evidence. It related to Coca Cola's position on the causation issue. The trial court properly admitted other evidence on Coca Cola Company's share of the lemon-lime consumer market as relevant to Coca Cola's theory of the case on the Section 2 monopolization claim. Bubble Up's motion for new trial on these grounds was properly overruled.[26]

## CONCLUSION

This was a hotly contested eight week jury trial. Both parties presented their positions forcefully and thoroughly in the court below. The jury heard the evidence, and rendered its verdict after receiving comprehensive instructions from the trial judge. We have carefully considered Bubble Up's claims of error, but reject all of them. The jury's verdict must stand.

Affirmed.

25. *Compare* Semke v. Enid Automobile Dealers Ass'n, 456 F.2d 1361 (10th Cir. 1972) *and* Sablosky v. Paramount Film Distributing Corp., 137 F.Supp. 929 (E.D.Pa.1955) *with* Bordonaro Bros. Theaters v. Paramount Pictures, 203 F.2d 676 (2d Cir. 1953) *and* Cape Cod Food Prod. v. National Cranberry Ass'n, 119 F.Supp. 900 (D.Mass.1954).

26. Since we uphold the jury's verdict absolving Coca Cola Company of any antitrust liability, we do not consider Bubble Up's complaint of improper exclusion of evidence relating to damages.