JOYCE BEVERAGES OF NEW YORK, INC., Plaintiff and Counterclaim Defendant,

v.

ROYAL CROWN COLA CO., Defendant and Counterclaim Plaintiff,

v.

The SEVEN–UP COMPANY, Additional Counterclaim Defendant.

No. 82 Civ. 8485(MP).

United States District Court, S.D. New York.

Jan. 18, 1983.

Milgrim, Thomajan, Jacobs & Lee by Victoria A. Cundiff, New York City, Sperling, Slater & Spitz, by Paul E. Slater, Chicago, Ill., Pedersen & Houpt, Chicago, Ill., William J. Collier, Jr., Timothy J. Joyce, New Rochelle, N.Y., for plaintiff.

Kirkland & Ellis, by James H. Wallace, Jr., John B. Wyss, Thomas W. Queen, Washington, D.C., Townley & Updike by James K. Leader, New York City, for defendant.

## OPINION

MILTON POLLACK, District Judge.

This is an application for a preliminary injunction pursuant to Rule 65 Fed.R.Civ.P. to restrain the defendant from terminating an exclusive franchise to distribute soft drinks and colas in the New York area and to restrain the defendant from naming another distributor in place of plaintiff. It is claimed that if the prospective termination does not constitute a breach of the contract between the parties, then the contract clauses upholding the contract violate Section 3 of the Clayton Act or Section 1 of the Sherman Act.

Finding that the plaintiff has not shown any threat of irreparable damage or probability of success on the merits of the issues with respect to the contract or the antitrust issues or sufficiently serious questions going to the merits to make them a fair ground for litigation with a balance of hardships tipping decidedly toward the plaintiff, preliminary injunctive relief will be denied.

*The Parties.*

Defendant Royal Crown Cola Co. (Royal Crown) is principally engaged in the licensing of its trademarks and the sale of secret soft drink concentrates to its independent bottlers. Under license from Royal Crown,

the bottler uses the secret concentrates to produce finished soft drink products, which the bottler then promotes and distributes. Royal Crown products include ROYAL CROWN COLA, DIET–RITE COLA, RC–100, and DECAFFEINATED RC.

In the calendar year ending December 31, 1981, combined sales of the Royal Crown cola brands accounted for approximately 5 per cent of United States cola sales.

Plaintiff, Joyce Beverages of New York, Inc. (Joyce), manufactures and sells soft drinks under license from several trademark licensors, including Royal Crown. In addition to the Royal Crown cola products, Joyce distributes 7–UP lemon-lime soft drinks, DIET 7–UP, A&W root beer, SUGAR–FREE A&W, PERRIER carbonated water, NESTEA iced tea, HAWAIIAN PUNCH and Royal Crown's NEHI fruit flavored soft drinks.

Since its origin in the last century, the United States soft drink industry has utilized the franchise system of distribution. Trademark licensors supply certain secret ingredients under license to local-independent bottlers, who produce, promote and distribute the finished soft drink products in designated territories. The market is highly competitive. The local bottlers engage in intense price and nonprice competition with one another.

*The Franchises.*

Under its license and franchise agreements with Royal Crown, Joyce received long-term (and in some cases potentially perpetual) exclusive rights to manufacture and sell the Royal Crown cola products within defined territories in the States of New York, New Jersey and Connecticut. The Royal Crown products involved herein are distributed pursuant to three separate contracts which cover ROYAL CROWN COLA, DIET–RITE COLA and RC–100 and DECAFFEINATED RC. All of Joyce's license and franchise agreements with other soft drink trademark licensors restrict Joyce's ability to bottle other brands of directly competing soft drinks. Thus, for example, Joyce's 7–UP franchise agreement expressly precludes it from bottling or distributing any other lemon, lime or lemon-lime soft drinks.

In its ROYAL CROWN and DIET–RITE license and franchise agreements, the bottler is required to use his "best efforts" to be devoted to building, maintaining and expanding the sales of those drinks, in a measure "satisfactory" to Royal Crown. These agreements were prepared and signed many years ago.

The bottler's agreements for DECAFFEINATED RC and RC–100 are up-dated versions of Royal Crown's license and franchise agreements and contain "exclusive efforts" clauses which expressly preclude the bottler from distributing any "substantially or reasonably similar" soft drinks and which provide that "any cola shall be deemed substantially or reasonably similar to any . . . cola [and] any diet cola to any . . . diet cola. . . ." The "best efforts" clause in these agreements provides that Joyce "shall devote its best efforts to the sale and promotion of sales of the beverages within and only within the territory . . . so as to achieve maximum distribution and sale for the beverages within the territory."

*Controversy Regarding The Contracts.*

Joyce is planning to commence the distribution of a decaffeinated cola product named LIKE, manufactured by the Seven-Up Company, which will be distributed for the first time in this area beginning not later than February 7, 1983. The history of this venture is as follows:

In early 1982, Joyce informed Royal Crown that the Seven-Up Company was planning to introduce a new cola beverage, known as LIKE. Royal Crown promptly informed Joyce that if Seven-Up offered Joyce a franchise agreement for this new cola product, Joyce would have to choose between LIKE and the Royal Crown colas. Seven-Up began introducing LIKE in test markets in the summer of 1982 and in its attempt to franchise bottlers, Seven-Up announced that it would "prefer an exclusive arrangement," meaning that its bottlers were not to carry any other cola beverages. Joyce's affiliated operations in Washington,

D.C., and Chicago, Illinois, signed LIKE franchise agreements on July 22, 1982. Under those agreements the Chicago and Washington operations are expressly precluded from bottling any other cola in their respective territories.

In July 1982, Seven-Up and Joyce discussed the LIKE franchise for the New York Metropolitan Area. Seven-Up initially proposed that Joyce take on LIKE under the same cola exclusivity terms appearing in the Chicago and Washington, D.C., agreements, thus requiring Joyce to drop the Royal Crown colas in exchange for the LIKE franchise in the New York area. Joyce did not accept this proposal.

On October 28, 1982, Seven-Up advised Joyce that it would be offered a "new approach" to the LIKE franchise agreement and that if Joyce did not reach a decision regarding this new approach by the Thanksgiving holiday, Seven-Up would "look for alternatives" beyond Joyce.

In November 1982, Seven-Up offered Joyce the LIKE franchise on a partial "co-existence" basis. Under this Seven-Up would permit Joyce to continue to bottle and distribute other colas for which it already had licenses while holding the LIKE franchise. However, if Joyce discontinued any of those cola beverages at any time, the discontinued colas would become subject to Seven-Up's general prohibition precluding Joyce from packaging and selling colas other than LIKE. This LIKE franchise agreement covered the same territories included within Joyce's Royal Crown license and franchise agreements. Learning of this proposal, Royal Crown, on November 2, 1982, told Joyce that "so long as our franchise agreements are in effect, you are obligated to employ your best efforts to market the franchised Royal Crown Cola Co. products," and called a meeting of representatives of the companies. At the meeting, which was held on November 8th, Royal Crown reiterated its view that the promotion and distribution of LIKE would constitute a breach of the Royal Crown cola licenses, and it reaffirmed its position a week later in a letter stating "In the event that you decide to bottle and distribute LIKE, your license and franchise agreements for Royal Crown's cola products must be terminated so that we may license a bottler willing and able to compete vigorously against all other cola products."

On November 22, 1982, before the Thanksgiving holiday deadline, Joyce signed a LIKE franchise agreement for the New York Metropolitan Area. Nonetheless, on November 30, 1982, the President of Joyce informed Royal Crown that Joyce had made no decision concerning the LIKE franchise agreement. However, on the next day, that President finally admitted that his company had signed the LIKE franchise agreement during the preceding week and stated that Joyce would not surrender its Royal Crown licenses and franchise agreements.

Shortly thereafter, Seven-Up wrote to Joyce to the effect that if LIKE was not introduced by February 7, 1983, it was understood between them that Seven-Up would not be obligated to fulfill its obligations under the LIKE franchise agreement with Joyce. As a backup for this eventuality, a witness from Seven-Up testified that Seven-Up contemplated going to available substitutes, such as the distributor for Canada Dry, a consortium of distributors presently distributing 7-UP in the area or perhaps to a warehousing arrangement.

Following its signature to the franchise with Seven-Up, Joyce undertook an extensive program to implement the preparations necessary to go into the market early in February 1983. This activity included contacting retailers, urging them to carry LIKE, and notifying them that it would begin distribution by February 7th.

On December 21, 1982, Joyce filed the present injunction action and requested accelerated discovery, which was granted and promptly undertaken. Joyce also sought an early hearing on an application for a preliminary injunction. The hearing thereon commenced on January 11, 1983. Testimony was adduced from witnesses in Court and by deposition and documentary evidence was presented and counsel were duly

heard. Decision was reserved thereon and due deliberation was had.

This action focuses on the cola licenses and franchise agreements which Joyce refuses to relinquish and which as colas, whether decaffeinated or not, or whether containing sugar or not, compete directly with LIKE. The plaintiff has acknowledged that its actions would violate the DECAFFEINATED RC cola franchise agreement, except possibly for any saving aspects of the antitrust laws.

Royal Crown contends that the acceptance by Joyce of a so-styled "co-existing" agreement from Seven-Up to manufacture, market, price, advertise and distribute a new competitive cola in the New York area creates inevitable and corrosive divided loyalty and effort and makes impossible a continued relationship between the parties of confidence and cooperation. Royal Crown contends that it contracted to obtain Joyce's best promotional effort under its licenses and franchises and had a right to expect no less and not merely a theoretically "even-handed" consideration as planned by Joyce.

The evidence establishes that Royal Crown bottlers do and must compete in a number of ways. In addition to the obvious price competition among colas, Royal Crown bottlers must compete for shelf space, display racks, promotional rotations and the placement of feature advertising. The competitive strategies employed by Royal Crown and its bottlers are highly confidential.

The acceptance of a license and franchise obligation to distribute and promote LIKE, the competitive cola of Seven-Up, factually and legally breaches Joyce's obligation to devote its "best efforts" to handle and expand Royal Crown's sales and to cooperate satisfactorily with Royal Crown in the manner in which Joyce is obligated under the licenses and franchises.

A best efforts clause is not *per se* breached by a mere undertaking of a competitive product line. *Cf. Polyglycoat Corp. v. C.P.C. Distributors,* 534 F.Supp. 200 (S.D. N.Y.1982); it depends on the circumstances.

However, the circumstances demonstrated by the record of the hearing establish beyond peradventure of doubt that Joyce's proposed effort to sell the new line of product to the established customers of the old product and the plan to use advertising and distribution methods developed in the promotion of the first for the promotion of the second product breaches the best efforts clause both factually and legally. The evidence establishes that the activity of Joyce would be so manifestly harmful to Royal Crown that it justifies the Court in finding that the new obligations to which Joyce has committed itself and its intended conduct breach its covenant to promote the product of Royal Crown. Joyce will control pricing, placement of local advertisements, special promotions, feature advertising and special displays of the two competitive products. It is important to emphasize that as a LIKE bottler, Joyce has already begun to convince retailers to purchase and display that product in their stores, and in connection therewith plans to offer them a massive giveaway, without charge, of LIKE to induce promotion thereof by the retailers and to gain good will therefor. Retailers have been and will be asked to devote a portion of their limited cola budgets and to edge into their shelf space a cola product competitive to Royal Crown. In addition, Joyce will begin seeking and seizing promotional and merchandising opportunities on behalf of LIKE cola. These activities will necessarily dilute Joyce's efforts on behalf of the Royal Crown colas. Joyce has thus impaired and disabled itself from devoting its "best efforts" to Royal Crown and from promoting the Royal Crown sales in a "manner . . . satisfactory" to Royal Crown. The described conduct and promotional plans of Joyce are a breach of the best efforts clauses contained in the Royal Crown contracts.

A few examples of the material conflicts which Joyce has created and is bent on may be examined. For example, Seven-Up's national advertising campaign denigrates the content of Royal Crown cola products. Seven-Up's slogan is "You don't need caffeine and neither does your cola." Joyce's

affiliated operations in Chicago, Illinois, and Washington, D.C., sponsor this very campaign in their respective territories and have supported advertisements thus materially denigrating the content of Royal Crown products. Joyce's LIKE franchise agreement requires it to sponsor this same campaign unless it believes that the campaign disparages the product of Royal Crown. It has already indicated by its midwestern distribution where it stands on such advertising. The vice-president of Seven-Up called by Joyce as one of its witnesses testified unequivocally that Seven-Up expects to use such a slogan in promoting LIKE in this area. Such advertisements in the franchised areas other than in New York warn of the supposed dangers of caffeine in an attempt to shift consumers away from ROYAL CROWN, DIET–RITE and other caffeinated colas. The sponsorship of such advertisements by Seven-Up's representatives or on behalf of Seven-Up or by Seven-Up in the Royal Crown territories will actually jeopardize Royal Crown's reputation among consumers. Joyce has not committed itself to refuse the use of such advertising in this area.

Dual loyalties akin to those presented by the evidence here were similarly criticized in *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835 (5th Cir.1975) at 840 n. 2: "A bottler with a dual franchise might be hesitant to strongly promote one cola product over the other, with competitive detriment to both syrup manufacturers."

Further examples of the clashes in handling the conflicting interests that Joyce will face if it tries to distribute both Royal Crown and LIKE include the need to keep each one's market strategies confidential and the selection of which cola should receive discount promotions the timing and the extent thereof. The latter are particularly relevant, as Royal Crown has historically competed by projecting itself as a low-price cola alternative to the major brands.

Plaintiff argued that it will be able to protect the interests of Royal Crown and LIKE "evenhandedly."[1] In light of the already planned giveaways of cases of LIKE, which will be an essential part of the promotion of LIKE, Joyce itself, right from the start, would have to subsidize equally large promotional discounts on behalf of Royal Crown cola products—whether or not requisite or timely—to impose even treatment. It strains credulity to think that Joyce is willing or able to take on LIKE and still promote Royal Crown evenhandedly, much less with its best efforts focused on its best interests under the circumstances.

Plaintiff argues that Royal Crown will not be forced to "sink or swim" on its own nor will it be allowed to go "down the drain." These arguments demonstrate a fundamental misunderstanding of the meaning of "best efforts." Joyce's duty is to expand Royal Crown's market share, to promote it vigorously, and not merely to keep it alive.

The impracticality of one distributor promoting more than one cola at a time has been clearly developed in the record. A market expert testified that if Joyce were to distribute both Royal Crown cola and LIKE that one of the products would fail within two to three years. In addition, the contract that Seven-Up executed with Joyce provides that if at any point Joyce

---

1. Plaintiff relies on *Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609 (2d Cir.1979), for the proposition that "even-handed efforts" are adequate to meet a "best efforts" provision of a contract. To the contrary, the Court in *Bloor, supra* at 614, stated:

> While the [contract clause] clearly required Falstaff to treat the Ballantine brands as well as its own, it does not follow that it required no more.... [It] imposed an added obligation to use "best efforts to promote and maintain a high volume of sales" .... Plain-

tiff was not obligated to show just what steps Falstaff could reasonably have taken to maintain a high volume for Ballantine products. It was sufficient that Falstaff simply didn't care about Ballentine's volume and was content to allow this to plummet so long as that course was best for Falstaff's overall profit [and distribution] picture, an inference which the judge permissibly drew.

*Bloor* clearly contradicts plaintiff's argument that even efforts are best efforts.

stops distributing Royal Crown cola, it may never again distribute another cola along with LIKE. Thus, even Seven-Up's strategy manifests the fundamental fact of business life that promotion of a cola product is deterred by the distribution of another cola product by the same distributor. Seven-Up has made crystal clear that it is unwilling to live with co-existence any longer than it has to.

There is no question but that the second distributorship which Joyce elected to contract for and that it is avidly implementing is factually and legally inconsistent with the "best efforts" obligation in the Royal Crown distributorship agreement—Joyce cannot properly serve two masters in the adverse relationship. The Court finds that Joyce will not be able to continue in the requisite rigorous promotion of Royal Crown while focusing on its individual interests in devoting its efforts to LIKE.[2]

■ Plaintiff argues that the contract clause providing for best efforts should not be interpreted to require exclusive efforts. This Court does not hold that the clause is violated merely as another cola has been signed. Instead, it is violated under the facts and circumstances disclosed in the evidence overall, by Joyce's conduct since signing the conflicting franchise, its plans and projections thereunder, and since the realities have precluded and will continue to impair its best efforts in promoting Royal Crown. At any event, the credible evidence demonstrates that the clause should be interpreted in the present facts and circumstances to mean that best efforts are exclusive efforts. The entire pattern of industry practice since the beginning of the soft

drink industry has been for distributors to distribute only one cola. This best efforts clause is properly read in terms of the trade practice and usage.[3] In addition, credible evidence demonstrates that the adoption of a new contract form by Royal Crown in which an exclusive dealing clause was expressed alongside of the best efforts clause was meant only to reflect and solidify what already was the understanding of the parties and the industry regarding the best efforts clause. The obligations of Joyce were the same for all the colas it was handling for Royal Crown—no new ones in the regard here discussed were added for the new drinks. Joyce gave no testimony that it had been asked to add a further restriction in this regard when it was presented with the new form.

■ In sum, the actions of Joyce are and constitute a material breach of its obligations to Royal Crown under their agreements. Under all the facts and circumstances presented here, cancellation of the Royal Crown franchises and licenses to Joyce would not be a breach on the part of Royal Crown.

Joyce has not demonstrated any likelihood of success on its claim under the contract, nor has it shown any question that presents a fair ground for litigation.

*Antitrust Matters.*

■ The exclusive dealing arrangement with Royal Crown does not violate the test of legality set out in the Clayton Act (and thus necessarily, in these circumstances, does not violate Section 1 of the Sherman Act).[4] The economic justification for the

---

**2.** Plaintiff contends that Joyce has been successfully able to promote Seven-Up and Royal Crown colas at the same time and that it will thus be able to promote LIKE and Royal Crown at the same time. This argument has no merit. The testimony demonstrates that the industry practice for promoting colas is to promote one cola at a time because colas constitute a distinct segment of the soft drink market. Thus, it is feasible to promote Royal Crown and Seven-Up simultaneously, but not to promote Royal Crown's colas and LIKE simultaneously.

**3.** *See* U.C.C. § 1 205 (1964). (An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance.); U.C.C. § 2 202. *See also Schubtex, Inc. v. Allen Snyder, Inc.,* 49 N.Y.2d 1, 424 N.Y.S.2d 133, 135, 399 N.E.2d 1154, 1156 (1979) (Evidence of trade usage may normally be utilized to supplement the express terms of a contract for the sale of goods).

**4.** *See American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1250 (3d Cir.1975). At any event, the Section 1 rule of reason test

exclusive dealing contracts is seen in the necessity for each bottler to carry only one product in order to increase the competition between the brands. Since the dawn of the industry, soft drink bottlers have carried only one national cola brand, only one national brand of lemon-lime beverage, etcetera. This practice insures that the bottler devotes undivided loyalty to its particular brand and that it competes vigorously against all competing brands. The bottlers have agreed to devote their "best efforts" to a single brand of each type of national soft drink. In exchange for this and to promote competition, soft drink trademark owners have granted long term (often perpetual) territorially-exclusive licenses to their bottlers.

The effect of the exclusive distributorship does not substantially lessen competition, as was demonstrated by the credible testimony, nor does it tend to create a monopoly in the line of commerce here present. 15 U.S.C. § 14.[5]

Joyce has asserted that the following criteria must be met before a distributor can adequately represent LIKE in the New York Metropolitan Area market:

1. The distributor must be able to reach the entire market area.

2. The distributor must have an adequate level of volume so that it can command compliance from the retail sellers.

3. The distributor must be able to sell to stores, fast-food chains, restaurants, and through vending machines.

4. The distributor must have adequate supply facilities and a history of acceptable performance in the distribution of Seven-Up products.

Joyce has not borne its burden of showing that LIKE will be foreclosed from the market by reason of any inability to find a distributor meeting these qualifications in New York. There are viable alternative methods of distribution for LIKE in the New York area. Other distributors besides Joyce, many of whom even presently distribute other Seven-Up products, have expressed their willingness to distribute LIKE. Indeed, a vice-president of the Seven-Up Company testified that Joyce was not the company's only choice for a distributor in New York, but merely its first choice. LIKE, while it is a new Seven-Up Company entrant, cannot be characterized as a fledgling product. It is sponsored by the Seven-Up Company, is being distributed in other areas, and behind the Seven-Up Company is its affluent parent, Philip Morris. Thus, LIKE has the prestige, resources and contacts to ease its way into the market it seeks to add. There has been no showing that the use of a dealer with all of the above characteristics is necessary for market entry. There is no showing that this list of characteristics is met by distributors in other regions of the country where Seven-Up will distribute LIKE.

A market expert testified that LIKE will be able to satisfactorily penetrate the market even if Joyce is not its distributor. Indeed, it appears from a preponderance of the evidence that the Court credits that the above list was presented merely to describe Joyce and not the necessary distributor. There are numerous ways in which Seven-Up will be able to enter the New York market. There has been no credible showing that the absence of any of the listed characteristics will prejudice LIKE's entry.

Joyce argues that if it does not maintain the Royal Crown franchise, it will not be strong enough to promote LIKE successfully. This argument is not credible. There

is not violated by the contract provision in question as the exclusivity requirement encourages rather than forecloses competition.

5. The test for a violation of Section 3 of the Clayton Act is set forth in *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Standard Oil Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93

L.Ed. 1371 (1949). In addition to evaluating the foreclosure of competition, it is necessary to consider the economic justification for the challenged clause. *Susser v. Carvel Corp.,* 332 F.2d 505 (2d Cir.), *cert. granted,* 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

has been no showing that any other company will terminate Joyce if Joyce is unable to continue to distribute Royal Crown products. There has been no evidence presented of what volume of sales by Joyce is necessary to allow it to maintain its distributorships for the other beverage manufacturers, and there has been no showing that if Joyce begins to distribute LIKE instead of Royal Crown there will be a decrease in the overall volume sold by Joyce.

To the contrary, the credible evidence establishes that all parties feel that LIKE will be able to replace the volume of Royal Crown products, after a temporary period of adjustment. Thus, Joyce, without Royal Crown, will be able to promote LIKE, according to the witnesses.

Indeed, the arrangement that will arise if Joyce distributes LIKE and Royal Crown uses another distributor or set of distributors, increases rather than forecloses competition, as four distributors would then be distributing four colas. The equivalent will result if Joyce continues to distribute Royal Crown and Seven-Up uses another distributor or distributors. Under either situation, there will be the "fierce" interbrand competition testified to between Coke, Pepsi, Royal Crown and LIKE. If both LIKE and Royal Crown were in the hands of Joyce, these two colas would "never" compete with one another, according to John M. Joyce, III.

The crucial inquiry is whether the opportunities for other competitors to enter or remain in the market has been significantly limited. The test is whether the system of challenged exclusivity arrangements in fact forecloses competition from a substantial market.

On the facts and circumstances shown herein, there is no antitrust law impediment to the entry into the market or to competition or to termination of Joyce's license and franchise from Royal Crown on the basis of Joyce's election to accept a franchise from Seven-Up. The indicia for these findings and conclusion are ample.

Even if it is costly for Joyce to distribute LIKE, this does not mean that Seven-Up is being deterred from entering the cola market. Seven-Up is a large, well-financed company, solidly backed by its parent, Philip Morris, and has the ability and means to get into the cola market with LIKE.

No matter how the market is defined, Seven-Up is not being foreclosed from entering into the New York area with LIKE. The way the market has been traditionally structured with exclusive bottler representation is consistent with and aids competition—while coexisting franchisers would tend to deter competition.

Royal Crown is neither a dominant nor a leading firm in the New York area; its insignificant market share places it a distant third behind Coca-Cola and Pepsi-Cola, the true giants of the cola industry. In contrast, Joyce is one of the nation's largest soft drink bottlers not under contract with Coke or Pepsi.

Enforcement of the license and franchise agreements between Joyce and Royal Crown will actually promote competition by assuring the New York area of four vigorous cola competitors: A Coke bottler, a Pepsi bottler, a LIKE bottler, and a Royal Crown bottler. The agreement also assures that LIKE and the Royal Crown colas will compete against one another, rather than falling under Joyce's common control and "never" competing.

This promotion of competition which will result from the construction of the best efforts clause as an exclusive dealing clause is an economic justification of the exclusivity requirement. Even if the Court were to find, which it does not, that LIKE was slightly deterred from entering the New York market, the promotion of competition would constitute an offsetting economic justification of the clause.

Thus, Joyce has not demonstrated any likelihood of success on the merits of its claim that Royal Crown's termination of the contract will violate either the Sherman or Clayton Acts. Nor has Joyce presented any question that presents a fair ground for litigation.

*Irreparable Injury and The Equities.*

 No irreparable harm will result to Joyce from its decision to go forward with the distribution of LIKE. Indeed, any "injuries" resulting from the loss of the Royal Crown licenses are entirely deliberately selected. Joyce has conceded that the shift from Royal Crown to LIKE will involve nothing more than a difficult "period of adjustment." Seven-Up cola products will replace Royal Crown cola products throughout Joyce's territories. According to Seven-Up's and Joyce's own market estimates, initial sales of the LIKE cola products will reasonably soon exceed or at worst be only slightly below Joyce's Royal Crown sales and will then grow to significantly exceed the Royal Crown level within one year. Moreover, no downward "adjustment" in cola sales in the Joyce territory will result in the loss of any of Joyce's other soft drink licenses. Instead, Joyce will continue to distribute a full line of soft drink products. Within its defined territories, Joyce will remain the exclusive bottler for those products and maintain an uninterrupted relationship with every existing customer. Consequently, the loss of the Royal Crown cola licenses should not threaten Joyce with loss of good will. The credible evidence clearly demonstrates that while there may be slight disruption of part of the business of Joyce, there will certainly be no destruction of any aspect of its business.

The balance of hardships in this case tips decidedly against any Joyce request for preliminary relief. Joyce is not asking the Court to preserve a status quo. Joyce seeks to freeze Royal Crown while Joyce disrupts the status quo. If the requested injunction is granted, Royal Crown would be forced to endure an unsatisfactory relationship with an untrusted licensee while having no other representative to sell the Royal Crown colas within a large geographic area. Moreover, the President of Joyce has stated that he will "never" compete against the LIKE colas on behalf of the Royal Crown colas. Such diminution in sales effort would seriously injure Royal Crown in the New York Metropolitan Area.

Royal Crown's serious injury, some of which is already in progress, far outweighs the limited and speculative injuries alleged by Joyce and the balance of hardships in this case weighs in favor of Royal Crown and against Joyce on this petition for provisional relief.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

The motion for a preliminary injunction is in all respects denied.

SO ORDERED.