**SEVEN STAR SHOE COMPANY, INC., Plaintiff,**

v.

**STRICTLY GOODIES, INC., Good Times Industries, Inc., Ronald W. Gootkin, Robert Y. Greenberg and Ernest Williams, Defendants.**

No. 83 Civ. 2904 (RWS).

United States District Court, S.D. New York.

March 26, 1987.

Herbert Monte Levy, New York City, for plaintiff.

Zavin, Sinnreich & Wasserman, New York City, for defendants Good Times Industries, Inc., Robert Y. Greenberg and Ernest Williams; Jonathan Zavin, Andrew R. Schein, of counsel.

Schwartz & Schlacter, New York City, for defendants Strictly Goodies, Inc. and Ronald W. Gootkin.

SWEET, District Judge.

Defendants Strictly Goodies, Inc. ("Strictly Goodies"), Ronald Gootkin ("Gootkin"), Good Times Industries, Inc. ("Good Times"), Robert Greenberg ("Greenberg"), and Ernest Williams ("Williams") have moved pursuant to Fed. R.Civ.P. 56 for an order dismissing the complaint against them. Strictly Goodies has also moved for partial summary judgment on its counterclaim in the amount of $14,515.95. Seven Star Shoe Co. ("Seven Star") has cross-moved for an order granting summary judgment on its complaint, striking the defendants' counterclaims, and requiring an accounting of the defendants. For the reasons set forth below, summary judgment is granted on behalf of Good Times, Greenberg, and Williams, and the complaint shall be dismissed as against them. The application by Seven Star is granted in part, and the application by Strictly Goodies is denied.

## Facts

This diversity case raises the question of a sales representative's commercial fidelity to a footware manufacturer. In early 1982, Seven Star makers of a popular sneaker known as the "pie" shoe, signed a contract with Strictly Goodies which made Strictly Goodies "the exclusive representative" in California, Hawaii, Nevada, Arizona, Washington, and Oregon of Seven Star's footware line. Strictly Goodies was to receive a six percent commission on the Seven Star shoes that it sold, including the hot "pie" shoe. The contract reads:

This contract confirms our agreement whereby Strictly Goodies Incorporated, an independent manufacturers representative, and Seven Star Shoes, a wholesale shoe manufacturer, join in the following agreement:

1. Strictly Goodies agrees to sell and display Seven Star Shoes in our showroom and all shoe shows in our territory.

2. Strictly Goodies territory consists of California, Hawaii, Nevada, Arizona, Washington, and Oregon.

3. Seven Star Shoes agrees that Strictly Goodies will be the exclusive representative for the Seven Star Shoe Company for the above territories.

4. Strictly Goodies agrees to service all existing accounts in the above territory effective on January 12, 1982.

5. Seven Star Shoes agrees to pay Strictly Goodies 6% commission on all orders written by Strictly Goodies as well as all orders called in, written in or otherwise received by Seven Star Shoes from the above territory.

6. Seven Star Shoes agrees to pay Strictly Goodies 6% commission on all orders received and written at trade shows from the above territory, as well as trade shows outside the territory with accounts from the above territory.

7. Seven Star Shoes agrees to pay commission on the fifteenth of each month for all orders shipped up to and including the twenty-fifth of the previous month.

8. Commission refunds—Seven Star Shoes reserves the right to bill back Strictly Goodies for commissions paid on all non-collectible accounts that are 120 days old or over.

This agreement may be terminated by either party within thirty days by written notice.

At the time Seven Star and Strictly Goodies signed their agreement, Strictly Goodies was not carrying any other shoe lines. According to Gootkin, president of Strictly Goodies and a defendant himself, Strictly Goodies began to carry other lines of shoes within several months of its agreement with Seven Star, including Tom Brown Shoes, Jams, and Ciao. Although Gootkin has testified that "there are many, many multiple shoe line representatives in the business," Seven Star has submitted an affidavit from Arthur Jacob, president of the National Shoe Travelers Association (a not-for-profit association of approximately 6,000 wholesale shoe representatives),

swearing that the practice, usage and custom in the shoe industry is and always has been that a sales representative will not and should not take on a line directly competitive with the company he represents, in the absence of complete disclosure of such engagement, and without the prior written approval of the company which he first represents.

Before it carried shoes, as well as after it began to do so, Strictly Goodies had marketed other kinds of accessories, novelty shoelaces for instance. One supplier of shoelaces was Greenberg, president of defendant Good Times, who sold Gootkin shoelaces with pictures of the movie character "E.T." on them.

Sometime after Greenberg and Gootkin began to do business, Greenberg travelled from California to New York to meet with the owner and president of Seven Star, Larry Silverstein ("Silverstein"). Greenberg wanted to buy out Silverstein's business, but Silverstein thought Greenberg's offer was too low. After being rebuffed by Silverstein, Greenberg decided that Good Times would create its own line of sneakers, which it produced under the name L.A. Gear. Greenberg approached Gootkin and asked if Strictly Goodies was interested in carrying the L.A. Gear line, which Gootkin was. Consequently, Strictly Goodies began to sell L.A. Gear sneakers, including a shoe that Silverstein claims is a bald knock-off of the "pie" shoe, Gootkin was to be paid a commission of seven percent or more.

Gootkin says that it took on L.A. Gear because it offered more styles and colors, a more reliable supply, and filled a market niche that Seven Star was abandoning, that of a lower quality sneaker, because it was upgrading its sneaker by incorporating extras such as fancy sock liners. According to Gootkin, he did not contact Silverstein to tell him about the new line, nor did he make any effort to keep it a secret. He displayed both lines in his showroom and took both lines to show on sales calls.

In February, 1983, Silverstein received a report that Strictly Goodies was showing close copies of Seven Star shoes under L.A. Gear's label. After an unsatisfactory telephone conversation with Gootkin, Silverstein sent the following mailgram to Strictly Goodies cancelling the contract effective immediately:

IT APPEARS THAT YOU ARE WRONGFULLY DIVERTING OUR BUSINESS AND CUSTOMERS TO A DIRECTLY COMPETING ITEM CAUSING US SUBSTANTIAL DAMAGE. WE ELECT TO TERMINATE OUR AGREEMENT WITH YOU IMMEDIATELY FOR CAUSE. WE DEMAND THAT YOU IMMEDIATELY CEASE USING OUR CUSTOMER LIST AND TO CALL ON OUR CUSTOMERS UNDER THE PRETENSE YOU WILL BE SHOWING OUR LINE AT THE LONG BEACH SHOW.

WE DEMAND YOU RETURN TO GENERAL ELECTRIC EQUIPMENT LEASED TO US FOR USE IN YOUR OFFICE AND NOW IN YOUR PERSONAL POSSESSION. WE HOLD YOU RESPONSIBLE FOR ALL DAMAGES AND BUSINESS DIVERTED.

Silverstein also refused to pay Strictly Goodies the commissions on orders of Seven Star shoes already sold on the grounds that Strictly Goodies' perfidy had damaged Seven Star far beyond what was owing.

Seven Star subsequently sued Strictly Goodies and Gootkin for breach of contract, and Good Times, Greenberg, and another Good Times employee, Ernest Williams for the tort of interference with contract. Strictly Goodies has cross-claimed against Seven Star for the unpaid commissions.

All of the defendants have moved for summary judgment for an order dismissing the complaint, and Strictly Goodies has moved for an order granting it partial summary judgment in the amount of $14,515.95 on its counterclaim. Seven Star has conceded that the complaint against Williams should be dismissed, has opposed the motion with regard to the rest of the defendants, and has cross-moved against Strictly Goodies for an order dismissing the counterclaim and for an accounting of Strictly Goodies' alleged unfair profits.

### Good Times' Alleged Tortious Interference with Contract

■ Two factors are present in this case which increase the showing that Seven Star must make to sustain a claim of tortious interference. First, Good Times (the alleged tortfeasor) and Seven Star are business competitors. Second, the contract between Seven Star and Strictly Goodies, containing as it did a thirty-day cancel at will clause, was a contract that is "terminable at will." *Krim Cartage Co. v. Courier Services, Inc.*, 52 A.D.2d 831, 384 N.Y.S.2d 164 (1st Dep't. 1976). Under New York law, when these two factors are present, a competitor is not liable for interference with a contract "where the interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191, 406 N.E.2d 445, 448, 428 N.Y.S.2d 628, 632 (1980) (footnote omitted).

Here, it is apparent that the interference advanced Good Times' competitive interest, and Seven Star has cited no authority for the proposition that Good Times was engaged in an illegal restraint of trade. That leaves only the question of whether Good Times' acts were "wrongful," as defined in *Guard-Life.* The New York Court of Appeals has drawn a tight line around the concept of wrongfulness in this context:

> "Wrongful means" include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract.

*Id.* 50 N.Y.2d at 191, 406 N.E.2d at 448, 428 N.Y.S.2d at 632; *see also Strapex Corp. v. Metaverpa N.V.*, 607 F.Supp. 1047, 1050 (S.D.N.Y.1985).

■ Seven Star seeks to hang its hat on the "fraud" peg of this definition of wrongfulness. In essence they have argued that Silverstein's negotiations with Greenberg created a special "fiduciary relationship" between Seven Star and Good Times because during the failed negotiations Silverstein had proffered certain advice about running a shoe business. According to Seven Star, the existence of this relationship created a special duty on Good Times' part to disclose to Seven Star that it had begun to deal with Strictly Goodies. Through this omission, submits Seven Star, Good Times has defrauded them. Unsurprisingly, Seven Star has submitted no authority for the proposition that a brief, failed, arms-length negotiation between two parties creates a long-lasting "fiduciary relationship" between them. Quite the contrary, such a momentary brush in the marketplace is the virtual antithesis of a fiduciary relationship, and, consequently, Seven Star has failed to make out a case of fraud.

Seven Star having "failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," *Celotex Corp. v. Catrett*, — U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), Good Times and Greenberg's motions for summary judgment dismissing the complaint against them are granted.

### Strictly Goodies' Alleged Breach of Contract

As to Strictly Goodies' application for an order dismissing the breach of contract claims against it, the issue turns on what it means in the shoe business when one is a sales "representative." An affidavit submitted by President Jacob of the National Shoe Travelers Association, who has been affiliated with the shoe industry for more than forty years, swears:

> the practice, usage and custom in the shoe industry is and always has been that a sales representative will not and should not take on a line directly competitive with the company he represents....

All that Gootkin has submitted in opposition to this is his own conclusory statement that, "[t]here are many, many multiple shoe line representatives in the business." Unsupported by any examples or by an affidavit by anyone else in the business, a conclusion such as this drawn by one of the

parties is insufficient to create an issue of fact as to industry usage.

 Strictly Goodies has argued that any consideration of business custom and usage should be barred from the court's consideration by the Parole Evidence rule. However, under New York law, "A contract must be construed according to the custom and use prevailing in a particular trade." *Edison v. Viva Int'l, Ltd.*, 70 A.D.2d 379, 421 N.Y.S.2d 203, 205 (1st Dep't. 1979). Thus, for instance, the *Edison* court ruled that evidence had to be taken on what the words "edit" and "change" meant in the context of the publishing industry when addressing the question of breach of a contract to publish an article. *Id.*

This is not a case in which usage or custom is directly at odds with an express clause in a contract, *see, e.g., Kologel Co., Ltd. v. Down in the Village, Inc.*, 539 F.Supp. 727, 729 (S.D.N.Y.1982), because here the contract is silent on the question of whether Strictly Goodies may or may not carry other lines of shoes. Indeed, Strictly Goodies has essentially acknowledged the silence of the contract on this issue in arguing that the contract's explicit limitation on Seven Star's authority to use other representatives *implies* that Strictly Goodies was authorized to carry other shoe lines because of the absence of an explicit restriction. Lacking an explicit clause that speaks to the issue, the court is bound to consider business usage. Consequently, as Jacob's affidavit establishes, by agreeing to be a sales representative, Strictly Goodies was agreeing that it would carry only a single line of shoes. Since Strictly Goodies admits that it carried more than a single line, and that it started to do so within just a few months of entering into a contract with Seven Star, it has breached.[1]

**Conclusion**

For the foregoing reasons, the summary judgment motions of Good Times, Greenberg and Williams are granted, and the

complaint will be dismissed as to them. Seven Star's cross motion against Strictly Goodies is granted to the extent that Strictly Goodies is declared in breach of the contract. The single remaining question, therefore, is whether the damages that Seven Star incurred because of the breach exceed the amount of commissions owed Strictly Goodies for shoes already sold, or vice versa. Parties will contact chambers and a hearing on this issue will be set down within thirty (30) days.

IT IS SO ORDERED.

---

1. In addition to the counterclaim for commissions it says it is owed, Strictly Goodies has counterclaimed against Seven Star on the grounds that Seven Star allowed another sales representative to carry its line within Strictly Goodies' territory, which, according to Gootkin, happened in late 1982. Since Strictly Goodies had already itself breached by then by carrying other shoe lines, the counterclaim is dismissed.