**AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., Plaintiff,**

v.

**ACCU–WEATHER, INC., Defendant.**

v.

**THE WEATHER CHANNEL, INC., Additional Defendant.**

**No. 91 Civ. 6485 (RWS).**

United States District Court, S.D. New York.

April 5, 1994.

Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City (Richard Lehv, Howard M. Rogatnick, of counsel), for American Exp. Travel Related Services Co., Inc. and The Weather Channel, Inc.

Beckley & Madden by Thomas A. Beckley, John G. Milakovic, Harrisburg, PA and Owen & Davis, New York City (James M. Davis, of counsel), for Accu–Weather, Inc.

## OPINION

SWEET, District Judge.

American Express Travel Related Services Co., Inc. ("AMEX") and The Weather Channel, Inc. ("Weather Channel") have moved, pursuant to Rule 56, Fed.R.Civ.P. ("Rule 56"), for an order granting summary judgment on their request for a declaratory judgment that defendant Accu–Weather, Inc. ("Accu–Weather") does not own the mark 1–900–WEATHER, that an agreement between AMEX and Accu–Weather (the "Agreement") was properly terminated, that AMEX validly assigned the mark and telephone number 1–900–932–8437 to Weather Channel, that the use of that mark and number by Weather Channel does not infringe any right of Accu–Weather, that any application by Accu–Weather to register that mark is void, and dismissing all claims and counterclaims by Accu–Weather against AMEX and Weather Channel in this action.

Accu–Weather has moved, pursuant to Rule 56, for an order granting summary judgment in favor of Accu–Weather on all counts of Accu–Weather's Amended Complaint and awarding damages, holding that the mark 1–900–WEATHER and the underlying telephone number are the property of Accu–Weather and enjoining AMEX and Weather Channel from all further use of that mark and number, directing Weather Channel to transfer the underlying telephone

number to Accu–Weather, holding that AMEX and Weather Channel have engaged in unfair competition against Accu–Weather and enjoining such unfair competition, holding that Weather Channel tortiously interfered with Accu–Weather's contract rights under the Agreement, and scheduling a hearing to determine that amount of any additional damages suffered by Accu–Weather.

For the following reasons, AMEX's motion is granted in part and denied in part, and Accu–Weather's motion is denied.

## Parties

Accu–Weather is a Pennsylvania corporation with offices located in State College, Pennsylvania. AMEX is a New York corporation with an office in New York City. Weather Channel is a Virginia corporation with offices located in Atlanta, Georgia.

## Prior Proceedings

AMEX filed a complaint for a declaratory judgment in this Court on September 25, 1991. In February 1992, Accu–Weather filed an answer and counterclaims, naming Weather Channel as an additional defendant on the counterclaims. Accu–Weather also filed an action against AMEX and Weather Channel in the Court of Common Pleas in Centre County, Pennsylvania.[1] AMEX removed the Pennsylvania action to the United States District Court for the Middle District of Pennsylvania, and then moved to transfer it to the Southern District of New York. The District Court for the Middle District of Pennsylvania granted AMEX's motion, and the Pennsylvania action, 92 Civ. 705, is now pending in this court, where it has been consolidated with the instant action, 91 Civ. 6485.

The present motions were heard on December 21, 1993, and were considered fully submitted as of that date.

1. The claims asserted in Accu–Weather's Amended Complaint are identical to those asserted in its counterclaims in the declaratory judgment action filed in this Court by AMEX and Weather Channel.

2. An audiotext service is a system that allows two-way communication between a computer and a telephone caller. Using the keys on a

## Facts

This dispute involves the ownership and operation of an audiotext information service[2] (the "Audiotext Service") associated with the mark 1–900–WEATHER. Sometime in 1988, AMEX and Accu–Weather began meetings related to the formation of the Audiotext Service, which meetings eventually resulted in the signing of the Agreement, dated February 28, 1989.

In October 1988, AMEX contacted AT & T to request the telephone number 1–900–932–8437, which corresponds to 1–900–WEATHER. However, "900" numbers are assigned to various telephone carriers, such as AT & T, by a central clearinghouse. AMEX was unable to have the number 1–900–WEATHER assigned to it by AT & T until AT & T itself was assigned the block of numbers beginning with "932," which did not take place until June of 1989.

The Audiotext Service, described in the Agreement, worked in the following way. A caller to 1–900–WEATHER would hear the introductory statement: "Welcome to 1–900–WEATHER brought to you by American Express." The caller would then be given the option of hearing weather information for a particular city by pressing the area code in which the city is located (for U.S. cities) or the first three letters of the city's name (for foreign cities). The caller would then hear current time and weather conditions for that city, plus "the Accu–Weather forecast" for the city. The caller could, during the same telephone call, also access travel information for different cities, such as visa requirements and currency restrictions.

The caller was charged a set fee per minute for the call, which appeared on the caller's telephone bill. The service was available to the general public, not just to AMEX card members or purchasers of AMEX Travelers Cheques.

touch-tone telephone, the caller can instruct the computer to provide specific items of information from a menu of available information. The computer provides this information to the user in the form of spoken responses, previously recorded by a professional announcer, and then saved in the computer in the form of digital code.

The travel information available on the Audiotext Service was supplied by AMEX. Pursuant to the Agreement, the weather information was supplied by Accu–Weather in computer code on an hourly basis from its computers in State College, Pennsylvania, to the AMEX computers in the AMEX Travelers Cheque Operations Center in Salt Lake City. Accu–Weather developed computer programs that would take its weather information and convert it into coded formats in such a way that weather-related phrases, such as "sunny day," would correspond to a specific code number.

The AMEX computers in Salt Lake City contained software that enabled the computer to answer incoming telephone calls with pre-recorded introductory remarks, to give initial instructions, and to respond to instructions from the customer entered on the customer's touch tone key pad by providing the appropriate pre-recorded response. The AMEX software also enabled the computer to convert into spoken words the coded weather information arriving from Accu–Weather's computer or travel information for different countries and cities supplied by AMEX. The call ended with the statement "thank you for calling 1–900–WEATHER, and remember to take along American Express Travelers Cheques when you travel."

A "pilot" or test phase of the Audiotext Service was conducted in the Chicago area in March of 1989 using the mark WORLD-WIDE WEATHER LINE. The Audiotext Service was launched on a national basis in August of 1989 once the 1–900–WEATHER telephone number had been obtained.

Each month, American Express received a report from AT & T stating how many calls were placed to that number, giving the duration of the calls, the amount charged by AT & T to callers for those calls, and other information. With these statements, AT & T remitted to AMEX the amount charged to customers for these calls, less AT & T's own charges, taxes, and certain other deductions.

Pursuant to the terms of the Agreement, AMEX paid Accu–Weather a monthly fee for providing weather information and forecasts. This monthly fee would increase above a minimum amount if call volume exceeded a specified level.

AMEX employees operated its computers in Salt Lake City and administered the Audiotext Service from the headquarters of the American Express Travelers Cheque Group in New York City. AMEX addressed complaints from the public about the service, and selected, retained, and paid the professional announcer who made the recordings heard on the Audiotext Service.

AMEX was responsible for advertising and promoting the Audiotext Service. Both AMEX and Accu–Weather were referenced in the advertising, although references to both of these entities did not appear on all advertising.

AMEX was not pleased with the profitability of the audiotext service. In 1991, representatives of AMEX met with representatives of Weather Channel, which operates an audiotext weather service under the service mark THE WEATHER CHANNEL CONNECTION.

Weather Channel expressed an interest in obtaining the rights to the telephone number 1–900–932–8437 and the mark 1–900–WEATHER, as well as certain assets of the service. In September of 1991, AMEX concluded an agreement with Weather Channel, and on the same date, sent Accu–Weather a Notice of Termination, purportedly in compliance with ¶ 27 of the Agreement. AMEX notified AT & T to transfer the number 1–900–932–8437 to Weather Channel's service bureau, and at some point informed Accu–Weather that it would no longer accept information "feeds" from the Accu–Weather computers.

Under its agreement with AMEX, Weather Channel pays AMEX in installments for the assets assigned to it. These installment payments can, pursuant to the contract, increase above a minimum level if the call volume to THE WEATHER CHANNEL CONNECTION exceeds a certain amount, but they cannot exceed a maximum amount. Payments to AMEX will continue until December 11, 1995.

Accu–Weather's claim to ownership of the mark 1–900–WEATHER is based on ¶ 9 of the Agreement, which provides that:

All rights, title and interest in the weather information or products, and the ACCU–WEATHER trade name, or any other trade names, trademarks, symbols or identifiers used under this Agreement to designate the service furnished by ACCU–WEATHER, or in relationship thereto, or any instrument, device or formats used in connection with or in relation to the ACCU–WEATHER service, or any identifier embodying the prefix "ACCU," shall exclusively vest in ACCU–WEATHER.

Paragraph ¶ 27(C) of the Agreement, under which AMEX purported to terminate the Agreement, provides that:

AMERICAN EXPRESS shall have the right, upon fifteen (15) days prior written notice to ACCU–WEATHER, to terminate this Agreement at any time after one (1) year from commencement of the Nationwide Phase of the Audiotex [sic] Service, provided that AMERICAN EXPRESS discontinues the Audiotex [sic] Service at least for the duration of the unexpired portion of the initial term or the renewal term of this Agreement in effect at the time the agreement was terminated under this provision.

### Accu–Weather's Claims

Accu–Weather's first and second claims allege of breach of contract and assert that AMEX failed to terminate the Agreement properly because the 1–900–WEATHER service is allegedly being continued by Weather Channel, that the continued use of the Audiotext Service is occurring without the identification of Accu–Weather, that AMEX has discontinued accepting weather information from Accu–Weather, and that Accu–Weather is entitled to at least the minimum monthly payments due under the Agreement until July 31, 1993, and that AMEX has failed to provide an accounting to Accu–Weather.

Accu–Weather's third and fourth claims, entitled Breach of Contract and Trademark Infringement respectively, allege that, pursuant to ¶ 9 of the Agreement, Accu–Weather owns the trademark, trade name, symbol, identifier, and device 1–900–WEATHER.

Accu–Weather's fifth claim asserts that the activities alleged with respect to the previous claims constituted unfair competition. Count Six alleges that Weather Channel's activities constitute tortious interference with the Agreement.

### Discussion

#### Standards Applicable to a Motion for Summary Judgment

■ A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991). The moving party bears the burden of proving that no genuine issue of material fact exists. *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988); *Pittston Warehouse Corp. v. American Motorists Ins. Co.,* 715 F.Supp. 1221, 1224 (S.D.N.Y.1989), *aff'd,* 954 F.2d 62 (2d Cir.1992).

The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady,* 863 F.2d at 210; *see also Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983); *Swan Brewery Co. v. United States Trust Co.,* 832 F.Supp. 714, 717 (S.D.N.Y.1993).

■ When the provisions of a contract are susceptible to conflicting constructions and when there is relevant extrinsic evidence of the parties' actual intent, the meaning of the contract is an issue of fact barring summary judgment. *Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.,* 983 F.2d 1176, 1183 (2d Cir.1993); *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992); *Thompson v. Gjivoje,* 896 F.2d 716, 721 (2d Cir.1990) ("Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inap-

propriate."); *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 993 (S.D.N.Y. 1968) ("The letter killeth but the spirit giveth life.") (quoting 2 Cor. 3:6).

However, if a contract is unambiguous, its proper interpretation is a question of law that may be resolved by the Court on summary judgment. *Seiden*, 959 F.2d at 429; *In re Gas Reclamation, Inc. Sec. Litig.*, 741 F.Supp. 1094, 1097 (S.D.N.Y.1990); *Seven Star Shoe Co. v. Strictly Goodies, Inc.*, 657 F.Supp. 917 (S.D.N.Y.1987); *Leslie Fay, Inc. v. Rich*, 478 F.Supp. 1109, 1113 (S.D.N.Y.1979).

"The court should not find the language [of a contract] ambiguous on the basis of the interpretation urged by one party, where that interpretation would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.' " *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)); *see also Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 306 (2d Cir.1987) ("Courts may not create an ambiguity where none exists."), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). Extrinsic evidence as to the subjective intent of the parties is not admissible where a contract is unambiguous. *Eskimo Pie Corp.*, 284 F.Supp. at 993.

The preliminary question of whether a contract is unambiguous is a question of law that must be resolved by the Court before determining whether summary judgment is appropriate. *Seiden Assoc.*, 959 F.2d at 429. A contract term is ambiguous when, viewed objectively, more than one meaning may reasonably be ascribed to the language used. *Thompson*, 896 F.2d at 721. In determining whether a contract term is ambiguous, the term must be placed in "the context of the entire integrated agreement." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988). A court should "interpret a contract in a way that ascribes meaning, if possible, to all of its terms." *United States Naval Inst. v. Charter Comm., Inc.*, 875 F.2d 1044, 1049 (2d Cir.1989).

### Ownership of the 1–900–WEATHER Mark

ACCU–WEATHER claims that 1–900–WEATHER is "used under th[e] Agreement to designate the service furnished by ACCU–WEATHER, or in relationship thereto," or is an "instrument, device or format[ ] used in connection with or in relation to the ACCU–WEATHER service" within the terms of ¶ 9.

The first page of the Agreement states that,

WHEREAS, ACCU–WEATHER operates a professional weather service and maintains a staff of meteorologists trained, experienced, and skilled in the forecasting and prediction of weather and the processing of weather information and data; and

WHEREAS, AMERICAN EXPRESS desires to implement an interactive telephone call-in service that will provide its customers with weather reports, information and forecasts prepared under the supervision of professional meteorologists; and

WHEREAS, AMERICAN EXPRESS desires to receive such information at certain times and in certain forms tailored to its specific needs as more fully set forth below; and

WHEREAS, AMERICAN EXPRESS desires to secure the professional services of ACCU–WEATHER in these regards; and

WHEREAS, ACCU–WEATHER is willing to furnish such services to AMERICAN EXPRESS for the period and in accordance with the terms hereinafter set forth;

NOW THEREFORE ... ACCU–WEATHER agrees to furnish to AMERICAN EXPRESS during the term of this Agreement the weather and other reports, information and forecasts as specified....

Section 3.A. of the Agreement states that "AMERICAN EXPRESS shall have the sole and exclusive control over the marketing to the public of the telephone call-in weather reporting service described in Section 1 and 2 and Attachment A to this Agreement."

In determining whether a contract term is ambiguous, the term must be place in "the context of the entire integrated agreement." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988). Accu–Weather's

interpretation of paragraph 9 fails to do this. By relying on the language in ¶ 9 concerning ownership of marks "used under this agreement to designate the service furnished by Accu–Weather, or in relationship thereto," or "in connection with or in relation to the ACCU–WEATHER service," Accu–Weather ignores the fact that the Agreement makes reference to two different services.

The "service furnished by Accu–Weather" is the "professional weather service" referred to on page 1 of the Agreement. That service is different from AMEX's "interactive telephone call-in service," also referred to on page 1 of the Agreement. Thus, the reference in ¶ 9 to marks used to designate the service furnished by Accu–Weather, or in relationship or connection thereto, refers to marks used in relation to the weather information service provided by Accu–Weather. Use of the 1–900–WEATHER mark was made in relation to the interactive telephone call-in service operated by AMEX which utilized the Accu–Weather information and travel-related information provided by AMEX, among other things.

Paragraph 9 is not ambiguous in this regard, and the Court will not strain to find an ambiguity where none exists. AMEX's motion for an order granting summary judgment on their request for a declaratory judgment that Accu–Weather does not own the mark 1–900–WEATHER is therefore granted, and Accu–Weather's motion for summary judgment on their request for an order holding that the mark 1–900–WEATHER and the underlying telephone number are the property of Accu–Weather is denied.

### Termination of the Agreement

■ The dispute between the parties over whether AMEX properly terminated the Agreement concerns whether or not AMEX has "discontinued" the Audiotext Service within the meaning of ¶ 27 of the Agreement. AMEX claims that it has discontinued its service because it no longer uses its own voice-response software and hardware, it does not receive or answer any calls under the number 1–900–WEATHER, and does not receive or answer any calls seeking audiotext weather information. AMEX also no longer has any contractual relationship with AT & T

for the number 1–900–WEATHER and receives no income from AT & T.

However, AMEX is being paid in installments by Weather Channel, and those payments will increase if Weather Channel's call volume exceeds a certain minimum. Also, AMEX has agreed to continue to promote and advertise the 1–900–WEATHER telephone number. Further, AMEX has transferred the travel information that it prepared for the Audiotext Service to Weather Channel. (AMEX Rep.Mem. at 25.) Accu–Weather argues that, rather than discontinuing the service, AMEX has simply changed its supplier of weather information.

Some of the changes listed by AMEX to demonstrate that it has discontinued the Audiotext Service were permissible acts under its contract with Accu–Weather, which it could accomplish without the service being discontinued. Paragraph 3.C of the Agreement, for example, provides that the computer system and vendors for the Audiotext Service might be changed from time to time, and ¶ 4 allowed for changes in the voice that consumers would hear and in the formats and configurations without the service being considered discontinued. The fact that AMEX no longer uses its own computers, and does not control the consumer contact with the service is not determinative of whether the service has been discontinued.

Paragraph 27 of the Agreement is ambiguous regarding whether, in order to "discontinue" the Audiotext Service, AMEX would have to end all participation in it. Also, it is ambiguous regarding whether the continued promotional activities of AMEX, Weather Channel's use of the travel information prepared by AMEX for the Audiotext Service, and the fact that AMEX's payments from Weather Channel are dependant upon the volume of use of the Audiotext Service, constitute sufficient continuing involvement with the Audiotext Service to support a finding that the Audiotext Service had not been discontinued. Both parties have supplied extrinsic evidence regarding the intent of the parties that negotiated the Agreement, which evidence fails to resolve the ambiguity inherent in the contract itself.

As ¶ 27 is ambiguous regarding the meaning of "discontinue," summary judgment on all claims relating to the termination of the Agreement is denied. Likewise, Accu–Weather's unfair competition claim is predicated on the previously-discussed behavior of the Defendants. Summary judgment with regard to this claim is likewise denied.

### Tortious Interference with Contract

■ The elements of a tortious interference claim are a valid existing contract, the defendant's knowledge of the contract and inducement of a breach thereof, and resulting damage to the plaintiff. *See Strobl v. New York Mercantile Exch.,* 561 F.Supp. 379, 386 (S.D.N.Y.1983). The ambiguities in the Agreement discussed above make it impossible to determine whether a breach has occurred in this case.

■ A party can be liable for tortious interference with contract if they use false statements or unfair means to cause a party to exercise a contractual right to terminate a contract, however, mere inducements or persuasion to exercise an option to cancel are not actionable. *General Out Door Advertising Co. v. Hamilton,* 278 N.Y.S. 226 (Sup.Ct. N.Y.Cty.1935). Accu–Weather has not presented evidence of any fraudulent activities by Weather Channel that would warrant granting summary judgment in Accu–Weather's favor on its tortious interference with contract claim at this time.

■ Since the ambiguity with regard to ¶ 27 precludes a finding regarding whether there has been any breach of the Agreement, and since Accu–Weather has not presented evidence that Weather Channel fraudulently induced AMEX to terminate the Agreement, summary judgment is inappropriate with regard to the tortious interference with contract claim.

### Disclosure of Confidential Information

■ Paragraph 13.A of the Agreement provides that:

In performing the services described in this Agreement, the parties may have access to and receive disclosure of certain confidential information about the other party, including, but not limited to, mar-

keting philosophy, techniques and objectives, competitive advantages and disadvantages, financial results, historic response rate experience, customers' names and addresses and a variety of other information which the parties consider confidential and/or proprietary (hereinafter referred to as "Confidential Information"). The paragraph goes on to provide that such confidential information "is to be used solely in connection with [the parties'] obligations pursuant to this Agreement and that they shall receive such information in confidence and shall not disclose such information to any third party."

Accu–Weather asserts that AMEX disclosed confidential information in violation of ¶ 13 of the Agreement. The information that Accu–Weather asserts was disclosed consists of the telephone numbers of persons who called the Audiotext Service, information concerning the volume of calls received by the Audiotext Service, and an item that Accu–Weather refers to as the "Accu–Weather Forecast Script" (the "Script").

The Agreement indicates that the customers of the Audiotext Service were customers of AMEX. (*See, e.g.,* Agreement ¶ 2.A.) Information regarding the identity of customers of the Audiotext Service and the volume of calls are "about" AMEX, rather than Accu–Weather.

■ Also, ¶ 13.C(3) of the Agreement provides an exemption from the nondisclosure requirement for information that "lawfully beca[a]me available to such recipient party from a party other than the [disclosing party]." The identity of the callers was provided by AT & T on prepared computer tapes, and AMEX made one of these tapes available to Weather Channel in the course of their negotiations. Since AMEX and thereafter Weather Channel received this information from AT & T, this information falls within the exception of ¶ 13.C(3) of the Agreement.

■ With regard to the Script, ¶ 30 of the Agreement states that AMEX would "reserve[ ] the copyright in the template script(s) developed by AMERICAN EXPRESS for the Audiotex [sic] Service," while Accu–Weather would "reserve[ ] the copy-

242

right in the ACCU–WEATHER forecast script(s) delivered to AMERICAN EXPRESS pursuant to this Agreement." Accu–Weather alleges that AMEX delivered a copy of the Script to Weather Channel.

Without reaching the issue of whether Accu–Weather has a copyright on the Script, the Script is not "confidential information." Paragraph 13.C(2) of the Agreement provides that information is not confidential, within the terms of the Agreement if it "is or becomes part of the public knowledge or literature without breach of this Agreement by such recipient party." Individuals calling the Audiotext Service would hear audio renditions of as much of the Script as was relevant to the cities for which information was requested. The text of the Script, therefore, lost any confidentiality it may have had through audio broadcast on the Audiotext Service.

The Script also contained codes which would enable the AMEX computers to receive information feeds from Accu–Weather. The first page of the Agreement says that the information supplied by Accu–Weather shall be "tailored to [AMEX's] specific needs." Under ¶ 3.C, AMEX controlled the computer system for the Audiotext Service. Paragraph A of Attachment A to the Agreement states that all weather information "will be provided in a format approved by American Express." Like the information on the names and addresses of the customers of the Audiotext Service, therefore, information on the codes that the AMEX computers used to receive data feeds from Accu–Weather are "about" AMEX, not Accu–Weather. Accu–Weather has not provided any evidence that these codes contain any confidential information the disclosure of which would violate ¶ 13 of the Agreement.

*Conclusion*

For the reasons stated above, AMEX and Weather Channel's motion for summary judgment is granted in part and denied in part. In addition, Accu–Weather's motion for summary judgment is denied.

It is so ordered.